# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 17, 2008          Decided June 30, 2009

No. 07-1439

S&F MARKET STREET HEALTHCARE LLC, D/B/A WINDSOR
CONVALESCENT CENTER OF LONG BEACH,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 07-1502

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*John H. Douglas* argued the cause and filed the briefs for petitioner.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

*Meredith L. Jason* and *Jason Walta*, Attorneys, entered appearances.

Before: GINSBURG and HENDERSON, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: When S&F Market Street Healthcare LLC acquired a nursing home previously operated by a different company, it decided to meet its immediate staffing needs in part by offering temporary employment to employees of the prior operator. S&F informed the employees it would consider hiring those who met S&F's "operational needs" and it would hire them on an at-will basis, subject to a probationary period, to various drug and background checks, and to their signing an arbitration agreement. When it began operations, S&F implemented these and other new terms and conditions of employment.

The National Labor Relations Board later held that, because S&F failed to notify the employees that the terms and conditions of their employment would change, S&F was a "perfectly clear" successor within the meaning of *NLRB v. Burns International Security Services*, 406 U.S. 272 (1972). As such, S&F was bound by the collective bargaining agreement (CBA) between its predecessor and the Service Employees International Union and had violated § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5), by unilaterally changing the terms and conditions of employment prescribed in that CBA. Consequently, the Board ordered S&F to restore the preexisting terms of employment and to make the employees whole with back pay. S&F petitions for review, and the Board cross-appeals for enforcement, of that order.

We hold the Board erred in concluding S&F was a "perfectly clear" successor and was not entitled to implement new terms and conditions of employment. We therefore grant in part the petition for review and deny in part enforcement of the Board's order. We enforce the Board's order as it relates to matters S&F does not contest.

## I. Background

S&F Market Street Healthcare LLC (d/b/a Windsor Convalescent Center of North Long Beach) is affiliated with a chain of nursing and assisted living facilities managed by SnF Management and operated under the Windsor name. In 2004 S&F purchased Candlewood Care Center from Covenant Care Orange Inc. Covenant Care had collective bargaining agreements with the SEIU, Local 434B, covering two different bargaining units at Candlewood.

Prior to assuming control of the Candlewood facility, S&F concluded it would need to increase the level of care, replace the staff, and renovate the building. Closer to taking over on July 1, 2004 S&F decided it could not replace the entire staff at once because the turnover would be too disruptive to the residents. Instead, S&F decided to hire some of Candlewood's employees for up to 90 days while it continued to recruit new employees.

In June 2004 S&F caused applications for employment to be distributed to the existing staff. A cover sheet informed the employees that S&F "intends to implement significant operational changes" and "[c]urrent Candlewood employees interested in positions with [S&F] *must submit* the attached application for employment." Further, it advised, only "[a]pplicants who meet the [Company's] operational needs will be interviewed," and any offer of employment "will be

contingent on your passing a pre-employment physical, drug test and acceptable reference and background checks." The job application itself required the applicant to affirm his or her understanding that successfully passing the tests and checks was a condition of employment, that any employment would be at will, and that S&F "can change benefits, policies and conditions at any time."

At the end of June, S&F interviewed all the Candlewood employees who had submitted applications. In each interview, the applicant was informed that any possible employment would be temporary and would last no more than 90 days.

S&F's director of human resources sent to each employee who was selected a letter dated June 30 with the subject line "OFFER OF TEMPORARY EMPLOYMENT." The letter explained, "As a temporary employee of Windsor, you are not eligible for company benefits. ... Other terms and conditions of your employment will be set forth in Windsor's personnel policies and its employee handbook." The letter further stated the employment was temporary because S&F had not yet been able to assess the employee's "skills and abilities" or "the building's ongoing operational and staffing needs." It also noted that employment was at will and that "[n]o later than the expiration of the 90-day period, which ends on September 29th, your employment with Windsor will end, unless you are selected for regular employment." In order to accept the offer the addressee was required to sign and date the letter. Those hired also had to sign an "Agreement to be Bound by Alternative Dispute Resolution Policy," which provided that arbitration would be the exclusive means of resolving all disputes relating to termination of employment, unlawful discrimination, and sexual harassment.

S&F began operations on July 1 with approximately 120 employees. Most were former Candlewood employees newly employed on a temporary basis; 10 to 12 had not been employed by Candlewood. Seventeen Candlewood employees were not employed either because they had not applied or because they were not chosen.

At a staff meeting on July 9, S&F distributed to the employees handbooks describing Windsor's policies and its terms and conditions of employment. The temporary employees received a handbook dated July 1, 2004 that did not include information about employer-provided benefits. The "regular" employees (i.e., those who had not worked for Candlewood) received a handbook dated January 1, 2004, reflecting the most recent revision of Windsor's system-wide policies; this version did include information about employer-provided benefits.

S&F continued over the next three months to replace former Candlewood employees with new employees. By October 1 a majority of the company's employees had been hired from outside the Candlewood staff; some 30-40 of the Candlewood employees hired initially as temporary employees had been hired for regular employment and given the January 1 version of the handbook.

Also following the takeover, S&F invested about $500,000 to renovate the facility. Among other changes, S&F repainted the employee lounge and the hallway where Candlewood had hung a bulletin board for the use of the Union, at which time S&F removed the bulletin board.

Meanwhile, on July 1 the Union requested bargaining with S&F. The Company responded on July 7 that it had not yet hired a representative complement of employees, so the

Union's demand for bargaining was premature. The Union filed unfair labor practice charges, and the Board General Counsel issued a complaint alleging that when S&F began operating the facility on July 1, 2004, it became "a successor to Candlewood" but refused to bargain with the Union, in violation of § 8(a)(1) and (5) of the Act. The complaint further alleged that since July 1, 2004 S&F had made unilateral changes at the former Candlewood facility — removing union-related materials from a bulletin board, prohibiting the posting of union materials, and implementing new employment policies — again in violation of § 8(a)(1) and (5), and had violated § 8(a)(3) in several ways unrelated to the issue of successorship.

Following a hearing, an Administrative Law Judge found S&F was a successor to Candlewood. According to the ALJ, the "temporary" employees were actually akin to probationary employees because their work was to be evaluated during the period of temporary employment and they did not have a definite anticipated termination date. Therefore the temporary employees could be counted in determining whether S&F had a substantial and representative complement of employees, and whether a majority of that complement were from Candlewood, when S&F began operations on July 1. Having answered both questions in the affirmative, the ALJ concluded S&F was obligated to recognize and to bargain with the Union as of July 1.

At the same time, the ALJ found S&F, although a successor to Candlewood, was not a "perfectly clear" successor because S&F's pre-employment communications to the Candlewood employees put them on notice that the terms and conditions of their employment would change. Accordingly, although S&F was obliged to recognize and to

bargain with the Union, it was entitled first to establish the initial terms and conditions of employment.

The Board affirmed the ALJ's finding that S&F was a successor to Candlewood but went on, with Member Schaumber dissenting, to hold (1) as a matter of law, S&F was a "perfectly clear" successor and, (2) as a matter of fact, had "failed to clearly announce its intent to establish a new set of conditions prior to inviting former [Candlewood] employees to accept employment." *Windsor Convalescent Ctr. of N. Long Beach*, 351 N.L.R.B. 975, 980 (2007). The Board concluded, therefore, that S&F did not have the right unilaterally to set the initial terms and conditions of employment. S&F petitions for review solely of the legal and factual underpinnings of this determination.

The Board also held, and S&F does not contest, that S&F refused to hire four union stewards, suspended or terminated certain employees for engaging in protected activity, and informed employees the facility would be nonunion, all in violation of § 8(a)(1) and (3) of the Act; and, although a successor employer, S&F failed to recognize and to bargain with the Union, in violation of § 8(a)(5) of the Act. In keeping with this court's "longstanding rule," *Carpenters & Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808 (2007), "[t]he Board is entitled to summary enforcement of the uncontested portions of its order." *Flying Food Group Inc. v. NLRB*, 471 F.3d 178, 181 (2006).

## II. Analysis

We turn now to the two rulings S&F does contest. First, the Board held S&F was not only a successor but a "perfectly clear" successor and therefore could not lawfully set the initial terms and conditions of employment, as it did in

issuing the employee handbooks and removing the union bulletin board, without first having bargained with the Union. Second, the Board held that, even if S&F were not a "perfectly clear" successor, it could not unilaterally change the terms and conditions of employment because, it found, S&F had not specifically announced the new terms prior to becoming the incumbent employer on July 1.

We must uphold an order of the Board unless it rests upon a finding not supported by "substantial evidence," 29 U.S.C. § 160(f), or the Board failed to apply the proper legal standard or departed from precedent without giving a reasoned justification therefor. *Mail Contractors of Am. v. NLRB*, 514 F.3d 27, 31 (D.C. Cir. 2008). In this case we conclude the Board erred in applying the exception in *NLRB v. Burns International Security Services* for "perfectly clear" successors. 406 U.S. at 294-95. In addition, its finding that S&F failed to notify the employees of its intent to establish new terms and conditions is unsupported by substantial evidence, and its conclusion that S&F could not implement any terms or conditions it had not specifically announced prior to July 1 is an unjustified departure from Board precedent.

A. "Perfectly Clear" Successor Status

In *Burns*, the Supreme Court explained that, "although successor employers may be bound to recognize and bargain with the union," except in rare circumstances "they are not bound by the substantive provisions of a collective-bargaining contract negotiated by their predecessors but not agreed to or assumed by them." *Id.* at 284. The rare exception is for "instances in which it is perfectly clear that the new employer plans to retain all of the employees in the [bargaining] unit." *Id.* at 294-95. That is, "a successor employer is ordinarily

free to set initial terms on which it will hire the employees of a predecessor," but a so-called "perfectly clear" successor must bargain with the employees' representative before it changes any terms to which its predecessor had agreed. *Id.*

The "perfectly clear" exception is and must remain a narrow one because it conflicts with the "congressional policy manifest in the Act ... to enable the parties to negotiate for any protection either deems appropriate, but to allow the balance of bargaining advantage to be set by economic power realities." *Id.* at 288. In the Board's leading case on the "perfectly clear" exception, *Spruce Up Corp.*, 209 N.L.R.B. 194 (1974), *enf'd per curiam* 529 F.2d 516 (4th Cir. 1975), which came fast on the heels of *Burns* itself, the Board recognized the importance of the employer's right to set the initial terms and conditions of employment and the correlative narrowness of the "perfectly clear" exception. The employer there had expressed a "general willingness" to hire his predecessor's employees, but also announced he was going to change their commission rates. The employer "thereby made it clear from the outset that he intended to set his own initial terms, and that whether or not he would in fact retain the incumbent [employees] would depend upon their willingness to accept those terms." 209 N.L.R.B. at 195. For that reason, it could not be said the employer "plan[ned] to retain all the employees in the unit" and the Board held the "perfectly clear" exception did not apply. *Id.* The Board explained:

> the caveat in *Burns* ... should be restricted to circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment, or at least to circumstances where the new employer ... has

failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment.

*Id.* Thus, at bottom the "perfectly clear" exception is intended to prevent an employer from inducing possibly adverse reliance upon the part of employees it misled or lulled into not looking for other work.

The Board adhered to its original understanding of *Burns* as recently as *Ridgewell's, Inc.*, 334 N.L.R.B. 37 (2001), *enf'd* 38 Fed. Appx. 29 (D.C. Cir. 2002). In that case, the successor employer announced it would retain the incumbent employees but only as independent contractors. The Board found they continued to work as employees within the meaning of the Act rather than as independent contractors. 334 N.L.R.B. at 37. Nevertheless, the employer's announcement, although legally erroneous, was sufficient to avoid the "perfectly clear" exception because it "portended employment under different terms and conditions" and thereby put the employees "on notice that a new set of employment conditions would be in effect." *Id.*

In the present case the ALJ found S&F "informed the Candlewood applicants that they would be employed only in a temporary or probationary status for 90 days," which "should have signaled to the applicants that terms and conditions of employment with [S&F] were not going to be identical with those of its predecessor." 351 N.L.R.B. at 1001. As in *Ridgewell's*, the employer's announcement portended employment under different — indeed, significantly different — terms and conditions. Therefore, the ALJ held S&F did not violate the Act by setting the initial terms and conditions of employment.

The Board, however, reversed the ALJ and applied the "perfectly clear" exception because it found S&F had failed to announce its intent to establish new terms and conditions before it invited the former Candlewood employees to accept employment. That finding is unsupported by substantial evidence. On the undisputed facts of this case, no employee could have failed to understand that significant changes were afoot. The cover letter attached to each job application foretold "significant operational changes," identified various pre-employment checks and tests to be passed, and explained that any employment offered would be both temporary and at will. The Board discounted the cover letter on the ground that it "lacked any mention of intended changes to employees' terms and conditions of employment." *Id.* at 981. Yet under Candlewood's collective-bargaining agreements with the Union, as any employee would know, each employee with 90 days on the job had vested "seniority rights" and could not be terminated except for cause, which the Union could contest through the negotiated grievance and arbitration procedure. By announcing that any employment with S&F would be at will, therefore, S&F was announcing a very significant change in the terms and conditions of employment — both for those who had been employed by Candlewood for 90 days or more and for those who expected to be. In addition, by requiring its new employees to agree to its own alternative dispute resolution policy, S&F made it clear the grievance mechanism the Union had negotiated with Candlewood would not be available.

The Board not only muffed its reading of the record; it also misread *Burns* to require more from the successor employer than a portent of employment under different terms and conditions. Recall that the "perfectly clear" exception applies only to cases in which the successor employer has led the predecessor's employees to believe their employment

status would continue unchanged after accepting employment with the successor. Here, as we have seen, the employees had every indication — from S&F's job applications, interviews, and letters offering employment — that S&F intended to institute new terms of employment. Under a proper reading of *Burns* and *Ridgewell's*, therefore, S&F cannot be considered a "perfectly clear" successor.

The Board attempts to distinguish *Ridgewell's* as follows: "An announcement that workers will be hired as 'independent contractors' necessarily signals an intent to establish a new set of [employment] conditions, because it signals an intent to divest the predecessor's employees of 'employee' status altogether." *Id.* at 981 n.28 (internal citation and quotation marks omitted). That is obviously true but irrelevant: A successor need not signal an intent to divest the predecessor's employees of their status as statutory employees in order to signal its intent, as did S&F here, to establish new terms and conditions of employment under which some of the predecessor's employees may be hired.

The Board quibbles over when the employees may have received the June 30 offers of temporary employment, suggesting that some employees may have received their letters after S&F took over operations on July 1. The anachronism, if it occurred, changes nothing, however. First, as we have seen, the June 30 letter was not the only indication S&F provided to the Candlewood employees that the terms and conditions of their employment would change. Furthermore, because that letter was the very instrument by which the Company invited employees to accept employment with S&F, it was necessarily received "prior to inviting former employees to accept employment." *Spruce Up Corp.*, 209 N.L.R.B. at 195. That some employees may have received the letter immediately after the Company took over

the operation rather than immediately before cannot make the crucial difference under *Burns* unless the employees were misled into expecting the terms of employment to continue wholly without change.[*]

---

[*] In that regard the Board recounts in a footnote testimony indicating three former Candlewood supervisors told employees not to worry about their employment prospects or future salaries. 351 N.L.R.B. at 981 n.29. But, as the Board acknowledges, the ALJ made no finding that these statements occurred, *id*. at 981, let alone that they were made by agents of S&F, which argues, fairly enough, that former Candlewood supervisors were not authorized to speak for S&F. In any event, the statements do not contradict S&F's announcement that any employment would be temporary and at will. As the Board recognized in *Spruce Up*, *Burns* was not meant to force an employer "to refrain from commenting favorably at all upon employment prospects of old employees for fear he would thereby forfeit his right to unilaterally set initial terms"; the "perfectly clear" exception must be read narrowly so as not to "encourage employer action contrary to the purposes of th[e] Act" or "discourage continuity in employment relationships for such legalistic and artificial considerations." 209 N.L.R.B. at 195.

The only testimony that could provide support for the contention that S&F misled employees is that of a Candlewood employee who claimed S&F's director of human resources, in responding to employees' concerns about their wages being decreased, said "nothing was going to change." In fact, the only relevant evidence in the record is that nothing about their wages did change during their period of temporary employment. In any event, the alleged statement was denied both by another Candlewood employee and by S&F's human resources director and the ALJ did not resolve the dispute. Taking into account the totality of S&F's communications to the Candlewood employees, even if credited this piece of evidence is insufficient to support a finding that S&F materially misled the Candlewood employees. *See Pacific Micronesia Corp. v. NLRB*, 219 F.3d 661, 665 (D.C. Cir. 2000) ("To meet the requirement of 'substantial evidence,' the Board

Nevertheless, the Board concluded "there is no evidence that [S&F], prior to the takeover, informed Candlewood employees that those who were retained would be working under different core terms and conditions of employment." 351 N.L.R.B. at 981. We see two errors of law in this restatement of the "perfectly clear" standard.

First, the focus upon "core" terms and conditions misstates the rule, which is that the successor employer must simply convey its intention to set its own terms and conditions rather than adopt those of the previous employer. Granting that a trivial change in employment conditions may not suffice, there is no requirement in *Burns* or *Spruce Up* that the intended change(s) involve "core" terms. Whatever that term may mean, however, it surely includes instituting at-will employment and eliminating the negotiated grievance and arbitration procedure.

Second, the Board's holding achieves precisely what *Burns* and *Spruce Up* sought to avoid. In those cases the Supreme Court and the Board respectively started from the presumption that a successor employer may set its own terms and conditions of employment and reserved the "perfectly clear" exception for cases in which employees had been misled into believing their terms and conditions would continue unchanged. *See Burns*, 406 U.S. at 294-95; *Spruce Up*, 209 N.L.R.B. at 109. In this case, the Board presumed the predecessor's terms and conditions must remain in effect unless the successor employer specifically announces it will change "core" terms and conditions. Thus does the exception

must produce 'more than a mere scintilla' of evidence; it must present on the record 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into consideration the 'record in its entirety … including the body of evidence opposed to the Board's view'") (internal citation omitted).

in *Burns* swallow the rule in *Burns*.  Under the proper standard, S&F clearly comes within the protection of the rule rather than the straightjacket of the exception:  It was never "perfectly clear that the new employer plan[ned] to retain all of the employees in the unit," *Burns*, 406 U.S. at 294-95, let alone that it did so "with no notice that they would be expected to work under new and different terms," *Spruce Up*, 209 N.L.R.B. at 195 n.7.  On the contrary, the Company announced it would retain only those who met certain pre-employment tests and stated its intent to set new initial terms and conditions of employment.

B. Announcing Terms and Conditions After the July 1 Takeover

The Board held in the alternative that even if S&F had expressed a "sufficiently clear intent to change employment terms" and thus avoided being deemed a "perfectly clear" successor, S&F "still had an obligation to bargain over any unannounced specific changes to terms and conditions of employment occurring after July 1, including dismantling the bulletin board and issuing new handbooks."  351 N.L.R.B. at 982 n.31.  In the Board's view, that is, a successor employer may change preexisting terms and conditions of employment only to the extent it has specified those changes in advance of assuming control over the operation.

The Board's novel rule in this case misapplied its own precedent and that of the Supreme Court.  In *Burns*, the Supreme Court was perfectly clear that a successor employer is not bound by the substantive provisions of a CBA negotiated by its predecessor: "It is difficult to understand how [the successor employer] could be said to have *changed* unilaterally any pre-existing term or condition of employment without bargaining when it had no previous relationship

whatsoever to the bargaining unit and, prior to July 1, no outstanding terms and conditions of employment from which a change could be inferred." 406 U.S. at 294. True to this teaching, the Board in *Spruce Up* did not require the employer to announce in advance all (or indeed any) new terms it intended to establish upon taking over; it was sufficient that the employer had announced its intention to establish new terms. *See* 209 N.L.R.B. at 195. S&F, having put the employees on notice of that intention, was not bound by the Candlewood CBA but was free unilaterally to implement its own initial terms and conditions of employment.

In support of its view, the Board offers *Banknote Corp. of Am.*, 315 N.L.R.B. 1041 (1994), *enf'd* 84 F.3d 637 (2d Cir. 1996). In that case the Board correctly stated that an employer is free to set initial terms and conditions prior to hiring its predecessor's employees. 315 N.L.R.B. at 1042. The wrinkle in that case was that, when interviewing for jobs with the new employer, "the employees were told [working conditions] would be about the same." *Id.* at 1043. Subsequent changes were thus a deviation from the terms under which the employees were told they were being hired. *Banknote* therefore stands for the principle that once an employer has hired its predecessor's employees under any specified terms and conditions of employment — its own or those in its predecessor's CBA — it must bargain over subsequent changes.

In this case, the offer of temporary employment S&F made to former Candlewood employees, which they had to sign in order to accept employment with S&F, incorporated by reference the employee handbook; and the handbook expressly stated the initial terms and conditions of employment that S&F set when it hired the employees. To reiterate the relevant facts, the successor employer: (1) before

soliciting job applications, informed the predecessor's employees of its intention to change the terms and conditions of employment; (2) upon hiring the predecessor's employees, explained that the new terms and conditions were set out in detail in the employee handbook; and (3) shortly after assuming operations, gave each employee a copy of the handbook. These steps together constitute the process by which the employer set the initial terms and conditions; it did not accept its predecessor's terms nor set its own initial terms, hire the employees upon those terms, and then unilaterally change them. Because the employer did not change any terms it previously established but merely replaced its predecessor's terms with its own, it was not required first to bargain with the Union over the content of the employee handbook or its removal of the bulletin board during its initial renovation.

## III. Conclusion

For the reasons set out above, we hold S&F was not a "perfectly clear" successor under *Burns*, nor was it obligated to bargain over initial terms and conditions simply because those terms had not been specifically announced prior to July 1, 2004. We therefore grant the petition for review and deny enforcement of the Board's order insofar as it requires that S&F restore the terms and conditions of employment established by its predecessor and make its employees whole for losses caused by its failure to apply the terms and conditions of employment that existed prior to its commencing operations. We grant the Board's cross-application for enforcement with respect to those aspects S&F does not contest.

*So ordered.*