# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 16, 2016        Decided June 30, 2017

No. 15-1113

ARC BRIDGES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 15-1143

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Raymond C. Haley III* argued the cause for petitioner. With him on the briefs was *Andrew M. Swafford*.

*Amy H. Ginn*, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

Dissenting opinion filed by *Circuit Judge* TATEL.

GINSBURG, *Senior Circuit Judge*: The National Labor Relations Board held that Arc Bridges, Inc. violated §§ 8(a)(3) and (1) of the National Labor Relations Act by failing to give a wage increase to represented employees, with whom it was then bargaining, when it increased the wages of its nonunion employees. The Employer petitioned this court for review. Because we hold that substantial evidence did not support the Board's findings, we grant the Employer's petition for review, vacate the Board's decision and order, and deny the Board's cross-application for enforcement.

## I.      Background

The Employer is a nonprofit corporation that provides "assisted living programs, employment counseling, and related support services for individuals with developmental disabilities." *Arc Bridges*, *Inc. v. NLRB*, 662 F.3d 1235, 1236 (D.C. Cir. 2011). In November 2006 and February 2007, the Board certified the American Federation of Professionals (the Union) to represent Arc Bridges' employees in two separate bargaining units, consisting respectively of a Day Services employee unit and Residential and Supported Living employee unit. *Arc Bridges, Inc.*, 355 NLRB 1222, 1222 (2010).

The Board found the sequence of relevant events thereafter was as follows. In May 2007, supervisor Raymond Teso told a future employee, Teresa Pendleton, during her interview that "the Union would be gone in November." Although he did not say so, November was the end of the one-year period following the Union's certification, during which the Employer could

"not withdraw recognition from the union and the Board [would] not entertain a petition contesting the union's majority status," *Arc Bridges, Inc.*, 362 NLRB No. 56, slip op. at 2 & n.9 (Mar. 31, 2015), https://www.nlrb.gov/case/13-CA-044627.

In June, the Employer's board of directors authorized management to give a three percent increase in wages to all employees. 355 NLRB at 1228 (ALJ Op.). In July, however, before any raise had been announced, the Union demanded changes in health insurance and retirement benefits and a 50% increase in wages over three years. *Id*. at 1227. Shortly thereafter the Employer provided the Union with its financial data indicating it had only $53,497 available to meet the Union's demands. *Id*. at 1227-28.

In July or August, area manager Bonnie Gronendyke told an employee, Shirley Bullock, that Executive Director Kris Prohl "was going to give us a raise until we voted the Union in." *Id*. at 1230. In August, Teso told Pendleton that the $56,000 the Employer had available to increase the employees' wages was instead being used to pay (presumably labor) lawyers. *Id*. Also in August, the employees in both units "voted to authorize the Union to call a strike." *Id*. at 1228.

In September, the Employer offered the Union a one-time bonus for all represented employees to be paid from "certain grant money" to come from an outside source. *Id*. The Union did not accept that offer and the grant eventually expired. *Id*. In October, the Employer gave a three percent wage increase to its nonunion employees, retroactive to July. *Id*. In the course of their bargaining at some time thereafter, the Employer offered the Union a one and half percent and later a two percent wage increase for represented employees. *Id*. at 1229.

In March 2008, no collective bargaining agreement having been reached,

> [t]he union filed a charge with the Board claiming that Arc Bridges had violated § 8(a)(1), (3), and (5) of the Act by granting the [retroactive] wage increase only to non-union employees. The Regional Director issued a … complaint focusing exclusively on the theory that Arc Bridges had violated § 8(a)(3).

662 F.3d at 1237.

The Administrative Law Judge dismissed the complaint after analyzing, under the burden-shifting framework of *Wright Line & Lamoureux*, 251 NLRB 1083 (1980), the Employer's failure unilaterally to increase the wages of the represented employees at the same time it gave the others a raise. 355 NLRB at 1231-32 (ALJ Op.). The ALJ first concluded "the General Counsel has not sustained her burden of proof under *Wright Line* by proving by a preponderance of the evidence that the employees' protected activity was a motivating factor for [the Employer's] withholding of the wage increase." *Id*. at 1232. Second, the ALJ held that, even if the General Counsel had carried her burden, "the [Employer] has met its *Wright Line* burden of proof by demonstrating it would have taken the identical action for legitimate, nondiscriminatory reasons." *Id*. In doing so, the ALJ determined that both the General Counsel's and the Employer's asserted rationales for the discriminatory wage increase were plausible: The employer could have "withheld the wage increase in order to punish and retaliate against the employees for bringing in the Union," or it could have withheld the increase as a "legitimate bargaining strategy." *Id*. The Board reversed the ALJ's decision on the ground that annual wage increases, "if sufficient funds existed," had become "an established condition of

employment" for all employees, the denial of which was a violation of the Act. 662 F.3d at 1238 (quoting 355 NLRB at 1223).

The Employer sought review of the Board's decision and this court reversed, finding the Board had ignored "evidence contradicting the practice" of yearly wage increases and holding the sporadic history of the increases had not made them a "condition of employment." *Id*. at 1240.

On remand, applying the *Wright Line* burden-shifting framework, a panel of the Board held the Employer's decision not to increase the wages of the represented employees was a violation of §§ 8(a)(1) and (3) of the Act because it was motivated by antiunion animus. 362 NLRB at 1. Member Miscimarra dissented. *Id*. at 6. The Employer again petitioned for review and the Board cross-applied for enforcement.

## II.     Analysis

This court "must uphold an order of the Board unless it rests upon a finding not supported by 'substantial evidence'" on the record taken as a whole. *S & F Mkt. St. Healthcare LLC v. NLRB*, 570 F.3d 354, 358 (D.C. Cir. 2009). We give

> substantial deference to the Board's factual inferences from the record before it, and [w]hen the Board concludes that a violation of the Act has occurred, [the Court] must uphold that finding unless it has no rational basis or is unsupported by substantial evidence. It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions.

*HealthBridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1067 (D.C. Cir. 2015) (citations and internal quotation marks omitted) (alterations in original).

We do not defer, however, when the Board fails adequately to explain why it has rejected the arguments for a different understanding of the evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496-97 (1951); *Allentown Mack Sales & Service, Inc. v. NLRB*, 522 U.S. 359, 378-379 (1998) ("When the Board purports to be engaged in simple factfinding, … it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands").

Here, the Board held the Employer's decision to raise the wages of the nonunion employees violated § 8(a)(3) and hence § 8(a)(1) of the Act.[1]  362 NLRB at 1.  Under § 8(a)(3), it is "an unfair labor practice for an employer … by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). For a violation of § 8(a)(3) under the circumstances presented here, the Board must find the Employer's discriminatory action was motivated by antiunion animus, an "intent[] to prejudice the employees' position because of their membership in the union." *NLRB v. Brown*, 380 U.S. 278, 286 (1965).

The Board has long held:

---

[1] "[A] violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1)," *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (quoting *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983)).  Because the Board did not indicate the Employer committed an independent violation of § 8(a)(1), we address only § 8(a)(3).

> *Absent an unlawful motive*, an employer is privileged to give wage increases to his unorganized employees, at a time when his other employees are seeking to bargain collectively through a statutory representative. Likewise, an employer is under no obligation under the Act to make such wage increases applicable to union members, in the face of collective bargaining negotiations on their behalf involving much higher stakes.

*Shell Oil Co. (San Francisco, Cal.)*, 77 NLRB 1306, 1310 (1948). To assess whether there is an unlawful motive, the Board applies the *Wright Line* framework. First, the General Counsel of the Board "must make a prima facie showing sufficient to support the inference that protected [i.e., union-related] conduct was a motivating factor behind the [discrimination]." *Fort Dearborn*, 827 F.3d at 1072 (first alteration in original) (citations and internal quotation marks omitted). If the General Counsel meets her burden, the employer can prevail by showing "it would have taken the same action in the absence of the unlawful motive." *Id.*

Here we are called upon to determine whether substantial evidence supports the Board's conclusion that the Employer was unlawfully motivated in October 2007 when, while engaged in collective bargaining with the Union, it gave a wage increase to its nonunion employees. The Board relied for its conclusion upon four findings; these findings do not, however, even in the aggregate, provide substantial evidence in support of the Board's conclusion.

## A. Gronendyke's Remark to Bullock

First, the Board found Ms. Prohl "intended to give employees a 3-percent wage increase until they voted for the Union," based upon a statement by area manager Gronendyke

that Prohl "was going to give us a raise until we voted the Union in." 362 NLRB at 2, 3. The Board failed, however, to explain why this remark is anything more than an accurate statement of the same bargaining strategy the Board held in *Shell Oil* was lawful. *See Orval Kent Food Co.*, 278 NLRB 402, 403 (1986) (declining to infer an unlawful motivation from a manager's remark attributing a decision not to give wage increases to represented employees for having brought in the union because such "remarks were merely a realistic statement of the effects of the bargaining obligation which the [Employer] incurred when the Union was certified to represent the … employees"). The Board in its opinion and on appeal attempts to distinguish *Orval Kent* on the ground that the employer there also offered wage increases to the union during negotiations. 362 NLRB at 3 n.14. This factual difference is irrelevant, however, because the Board did not, in characterizing the manager's remark as "merely a realistic statement," rely at all upon the employer's having offered a wage increase to the represented employees.

## B. Gronendyke's Remark to Bullock and Teso's Remark to Pendleton

Second, the Board found the "[Employer]'s managers essentially encouraged employees to blame the Union … for Prohl's decision to withhold the increase from them," citing both Gronendyke's innocuous remark above and a statement made in August 2007 by supervisor Teso that the $56,000 previously budgeted for a raise was instead being used to pay the Company's lawyers. *Id*. at 3. The Employer contends that Teso's statement merely describes the financial constraints it faced because it had to expend resources on collective bargaining. We agree.

The Board cites our opinion in *Acme Die Casting, a Div. of Lovejoy Indus., Inc. v. NLRB*, 26 F.3d 162 (D.C. Cir. 1994), to support its argument that statements blaming the union for the lack of a raise show antiunion animus.  That case, however, does not suggest that a realistic statement of the employer's financial situation, such as Teso's, shows antiunion animus.  In *Acme*, the employer entirely refused to bargain with the union and, after not providing the usual semi-annual wage increase, the president of the company told a group of prounion employees: "I told you guys not to bother with the Union because that was going to happen, no raise."  26 F.3d at 163, 164.  In contrast, Teso's statement was made during ongoing bargaining and faults not the employees' decision to unionize but the Employer's increased costs, an unavoidable reality affecting its resources.  Perhaps the Board thinks employees do not understand that collective bargaining has costs in addition to benefits, but pointing that out is not an appeal to desert the Union.  *Cf. B.F. Goodrich Co.*, 195 NLRB 914, 915 n.4 (1972) ("Had the grant been accompanied by statements encouraging the employees to abandon collective representation in order to secure the benefit [given to nonunion employees] … we would have clear evidence of unlawful 8(a)(3) motivation").

The other cases the Board cites are similarly unhelpful.  *See Aluminum Casting & Eng'g Co.*, 328 NLRB 8, 9 (1999), *aff'd in relevant part,* 230 F.3d 286, 290 (7th Cir. 2000) (affirming § 8(a)(3) violation where employer discontinued its "established practice of granting annual across-the-board wage increases at the time the Union began its organizing campaign"); *Structural Finishing, Inc.*, 284 NLRB 981, 989, 1003 (1987) (holding employer violated § 8(a)(1), which does not require antiunion animus, by telling employees "the Union would not allow" raises); *American Girl Place*, 355 NLRB 479, 479, 487 (2010) (holding § 8(a)(1) violated where employer told employees it "suspended the process of

considering a wage increase" because of the union). We note, further, that neither Gronendyke nor Teso suggested the represented employees could capture the wage increase if they abandoned the Union.

## C. Prohl's Stated Business Justifications

Neither does the Board's finding that two of the Employer's business justifications for the discrimination were pretextual discharge the General Counsel's burden of establishing antiunion animus. First, Prohl testified that unilaterally giving the represented employees, like the nonunion employees, a three percent wage increase in October 2007, when the Union was demanding a 20% raise immediately and 50% over three years, would have likely provoked a strike, which the union members had then recently authorized. 362 NLRB at 3. The Board found this justification was "undermined" by Prohl's having several months later offered the Union a wage increase of less than three percent. *Id*. Second, the Board discounted Prohl's claim that she gave a three percent wage increase to the nonunion employees in October, retroactive to July, in order to stem the high quit rate among unrepresented supervisors and managers. *Id*. at 3-4. The Board did not credit this justification because the wage increase was given to all nonunion employees, not just managers and supervisors. *Id*.

The Board failed adequately to explain why these two justifications, which are respectively a facially reasonable bargaining strategy and a rational business decision, are indicative of antiunion animus. First, that the Employer later offered the Union a wage increase of one-and-a-half percent does nothing to support the inference that its October 2007 decision not to give the represented employees a three percent raise was motivated by antiunion animus; the Board offered

nothing to the contrary except its conclusory statement that the later offer "undermined" Prohl's assertion that at the earlier time she feared provoking a strike. This is a non sequitur. Why Prohl offered a raise of one-and-a-half percent in collective bargaining several months later, with no strike having been called, is not a matter of record. Board counsel simply failed to ask Prohl what circumstances, if any, had changed by the later offer. Therefore, there is no basis for the Board's conclusion that her later raise "undermined" her explanation for not offering a raise several months earlier. *See Universal Camera*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight"); *see also* 355 NLRB at 1232 (ALJ Op.) (concluding "it has not been shown that the [Employer's] rationale for withholding the wage increase … was advanced merely as a pretext to mask discriminatory behavior").

Second, the decision to extend a wage increase to all nonunion employees as a way of addressing the high turnover among managers and supervisors does not support the Board's inference that antiunion animus motivated the Employer's not increasing the wages of the represented employees, about whose wages it was then bargaining with the Union. The implication of the Board's reasoning is that the Employer would have been on solid ground if it had given the raise only to managers and supervisors – who comprised about 40% of the nonunion employees.[2] But the raise given to all nonunion employees was consistent with the Company's history of raising wages, if at all, for rank and file employees, whenever it raised wages of managers and supervisors. The Board's

---

[2] *See* 355 NLRB at 1227 (ALJ Op.) ("Approximately 121 individuals … are not represented by the Union; of this number approximately 70 [58%] to 80 [66%] individuals are not managers or supervisors").

attempt to spin these innocuous facts into an unlawful attempt to discourage union membership is simply unreasonable.

An additional problem with the Board's decision is its cursory treatment of the other justifications given by Prohl. *See* 362 NLRB at 4-5. She testified that if the Employer had offered a three percent wage increase in October, then it would have had nothing further to offer the Union. *Id*. at 8 n.7 (Dissenting Op.). The Board entirely failed to address why granting a three percent increase to represented employees would not have severely impaired the Employer's bargaining position. *See* 362 NLRB at 4-5. On appeal, the Board still does not address the substance of this justification for the Employer's conduct, although the Employer continues to press it.

Prohl offered a further explanation for her decision, as recounted by the ALJ: "Asked why she did not also grant the wage increase to the unit employees, Prohl testified that she was attempting to avoid a charge for 'not good faith bargaining.'" 355 NLRB at 1228 (ALJ Op.); *see NLRB v. Katz*, 369 U.S. 736, 745 (1962) (holding unilateral wage increase to represented employees violated § 8(a)(5) duty to bargain in good faith). The Board cannot dismiss these points without at least some cogent discussion of their merits. Here, however, the Board summarily dismissed Prohl's concerns, stating that the Employer could have permissibly discriminated if only it had not harbored an unlawful motive or if it had sought the Union's approval before giving represented employees a raise. 362 NLRB at 5 & n.18. The first possibility is now beside the point for, as we have seen, the Board's reasons for saying the Employer's motive was antiunion do not withstand scrutiny. As to the second possibility, the Board did not even address Prohl's concerns regarding the *ex ante* uncertainty of asking for the Union's approval. As Member Miscimarra put it: "if the

Union rejected the offer, she feared it would ... provoke a strike, and if the Union accepted the offer, the [Employer] would lose bargaining leverage." *Id*. at 8 n.7 (Dissenting Op.). Therefore, the Employer had no reason unilaterally to forgo its *Shell Oil* privilege by asking for the Union's permission.[3]

---

[3] This court's recent opinion in *Care One at Madison Ave., LLC v. NLRB*, 832 F.3d 351 (D.C. Cir. 2016), does not support a different conclusion. In that case, we held the timing of a discriminatory increase in health benefits three weeks before a scheduled union election was probative of antiunion animus. *Id*. at 359. The employer was not, we said, in a no-win position when deciding whether to "make benefits changes during the pendency of a representation election," *id*. at 359, because "a brief delay until after the election is a simple way to guard against a finding that the employer timed the announcement of the benefit in an effort to influence employees' voting behavior," *id*. at 360. Here, the represented employees were in the midst of bargaining and there is no hint in the record of another election in the offing. Therefore, the employer did not have the option of simply waiting "until after the election." *Id*.

*Care One* does not apply here for an additional reason. The Employer's discrimination occurred during the course of negotiations over wages. This difference is significant because the legal standards that apply to discrimination before and after an election are different. The *Shell Oil* privilege to grant benefits to nonunion employees absent antiunion animus does not apply pre-election; on the contrary, the Board "presumes" "the granting of benefits during an organizational campaign to be … objectionable 'unless the Employer establishes that the timing of the action was governed by factors other than the pendency of the election.'" *Noah's N.Y. Bagels, Inc.*, 324 NLRB 266, 272 (1997).

**D. Second Statement by Teso to Pendleton**

Fourth, the Board found that, because the Employer generally gave wage increases, if at all, in July, its decision to give a raise to the nonunion employees in October, one month before the end of the certification year for the Union, indicated an unlawful motive for the delay. 362 NLRB at 4. For this, the Board relied upon Teso's statement, when interviewing a prospective employee the previous May, that "the Union would be gone in November." *Id.* Teso's May statement, however, was made before the Employer's board of directors authorized a three percent wage increase (June) and before the Union presented its wage demands (July). The Board's proffered connection between Teso's May expectation that the Union would be gone after its first year and a finding of antiunion animus when the Employer five months later exercised its *Shell Oil* right is untenable, particularly in light of the ALJ's finding that Teso's statement "simply indicates that he believed no contract would be negotiated." 355 NLRB at 1232 n.14 (ALJ Op.).

Of course "[t]he Board is free to disagree with the ALJ," but under our case law it must "explain the basis of its disagreement." *Fort Dearborn*, 827 F.3d at 1073. Here the Board did not give a rational explanation for rejecting the ALJ's conclusion. As Member Miscimarra pointed out and the Employer here emphasizes, for Teso's statement to reflect the Company's antiunion animus when it later withheld the wage increase from represented employees, the Board would have to find that Teso knew or foresaw in May that the Employer would refuse to increase the wages of represented employees in October. *See* 362 NLRB at 11 (Dissenting Op.). The Board did not so find and the record would not support it.

## III.    Conclusion

Viewing the Board's four findings against the background of ongoing bargaining between the Employer and the Union, we hold substantial evidence does not support the Board's inference that antiunion animus motivated the Employer's decision not to give a unilateral wage increase to the represented employees in October 2007.  Therefore, we grant the Employer's petition for review, vacate the Board's decision and order, and deny the Board's cross-application for enforcement.

*So ordered.*

TATEL, *Circuit Judge*, dissenting: Over eighty years ago, Congress passed the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–69, to level an uneven playing field for American workers by "allowing [them] to band together in confronting an employer regarding the terms and conditions of their employment," *NLRB v. City Disposal Systems Inc.*, 465 U.S. 822, 835 (1984). Intending to "do more than simply . . . alter the then-prevailing substantive law," Congress "restructure[d] fundamentally the processes for effectuating [labor] policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body rather than the federalized judicial system." *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 288 (1971). Thus, the National Labor Relations Board was born.

Now, as at the Board's inception, its members are nominated by the President and confirmed by the Senate because of their expertise in labor policy. And now, as then, these members possess accumulated wisdom about the nuances of labor disputes due to their workaday experience enforcing the Act. *Cf. Humphrey's Executor v. United States*, 295 U.S. 602, 625 (1935) (characterizing independent agencies as "bod[ies] of experts who shall gain experience by length of service"). In short, Congress continues to "entrust[] the administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." *San Diego Building Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 242 (1959).

In stark contrast to the Board, the federal courts, composed of generalist judges, have no comparable expertise, experience, or accountability when it comes to labor matters. For this reason, once a reviewing court concludes that the Board is operating within its delegated authority, it affords the Board

great leeway. *Waterbury Hotel Management, LLC v. NLRB*, 314 F.3d 645, 650 (D.C. Cir. 2003) ("As we often observe, our role in reviewing decisions of the [Board] is limited."). Courts may set aside Board findings "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary," *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217 (D.C. Cir. 2016) (quoting *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011)), and "owe 'substantial deference' to inferences drawn by the Board from the factual record," *Tenneco Automotive, Inc. v. NLRB*, 716 F.3d 640, 647 (D.C. Cir. 2013) (quoting *Halle Enterprises, Inc. v. NLRB*, 247 F.3d 268, 271 (D.C. Cir. 2001)). Further—and central to this case—"[o]ur review of the Board's conclusions as to discriminatory motive is even more deferential, 'because most evidence of motive is circumstantial.'" *Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016) (quoting *Inova Health System v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015)). Together, these principles ensure that reviewing courts do not substitute their views of labor policy for those of the Board. Because the NLRB "has the primary responsibility for developing and applying national labor policy," we and the Supreme Court have "accorded [the] Board . . . considerable deference." *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990).

In the case before us, the Board had the difficult task of "applying the Act's general prohibitory language" to a unique "combination[] of events" that allegedly violated the Act. *Id.* (quoting *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 500–01 (1978)). By contrast, this court has a far simpler assignment: determining whether the Board's conclusions are supported by "substantial evidence." *See* 29 U.S.C. § 160(e). In concluding that they were not, the court micromanages the Board, second guessing its factual findings and evidentiary inferences. Although the court sets forth one plausible interpretation of the

record, the Board adopted another. I respectfully dissent, not because this decade-old labor dispute involving a small nonprofit in Indiana is especially important, but rather because it *is* important that reviewing courts refrain from resolving labor issues that Congress reserved for the Board.

**I.**

Under the *Shell Oil* rule, an employer collectively bargaining with a union may give unrepresented employees a benefit while withholding that benefit from represented employees. *Shell Oil Co.*, 77 NLRB 1306, 1310 (1948). The court accuses the Board of ignoring this rule in finding that Arc Bridges violated the Act by refusing to give represented employees a 3% raise. *See* Maj. Op. at 8. Quite to the contrary, the Board readily acknowledged the *Shell Oil* rule, *Arc Bridges, Inc. & American Federation of Professionals*, 362 NLRB No. 56, at 3 (2015) (citing *Shell Oil*, 77 NLRB at 1310), but simply pointed out—in accordance with its and our caselaw—that the rule comes with an exception: under NLRA section 8(a)(3), an employer engaging in collective bargaining may not treat represented and unrepresented employees differently on the basis of antiunion animus. *See id.*; *see also Acme Die Casting v. NLRB*, 26 F.3d 162, 166 (D.C. Cir. 1994) ("[T]he failure to increase [represented employees'] wages . . . constituted a § 8(a)(3) violation if [the employer's] decision was motivated by anti-union animus . . . ." (emphasis omitted)).

The question in this case, then, is whether Arc Bridges withheld a 3% raise from represented employees due to antiunion animus. To answer that question, the Board applied the two-part *Wright Line* test, and because that test boils down to finding facts and drawing inferences of animus, our deference to the Board is at its apex. *See Vincent Industrial Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000) ("We are even more deferential when reviewing the Board's

conclusions regarding discriminatory motive, because most evidence of motive is circumstantial."). Arc Bridges challenges neither *Wright Line*'s applicability nor our highly deferential standard of review. Rather, it simply disputes the Board's interpretation of record evidence.

In finding that the General Counsel had satisfied its *Wright Line* burden of showing animus, the Board relied on three pieces of evidence.

First, the ALJ and Board both found that Area Manager Gronendyke told employee Bullock that "Prohl was going to give [represented employees] a raise until [they] voted the Union in," and that Supervisor Teso told employee Pendleton "that $56,000 that had been budgeted for the represented employees now had to go pay for the lawyers." *Arc Bridges*, 362 NLRB No. 56, at 4 (internal quotation marks omitted). These statements, the Board determined, "essentially encouraged employees to blame the Union . . . for Prohl's decision to withhold the increase from them." *Id.* This conclusion is consistent with the Board's longstanding view that where a grant of benefits to unrepresented employees is "accompanied by statements encouraging the [represented] employees to abandon collective representation in order to secure the benefit, . . . [there is] clear evidence of unlawful [§] 8(a)(3) motivation." *The B.F. Goodrich Co.*, 195 NLRB 914, 915 n.4 (1972). Common sense underlies this expert judgment: if your supervisor told you that you would be getting a raise but for your union involvement, might you feel that your supervisor was tacitly encouraging you to abandon the union?

Unlike the Board, the court views Gronendyke's and Teso's statements as mere descriptions of Arc Bridges' "bargaining strategy" and "financial constraints." Maj. Op. at 8. And without explanation, it asserts that Teso's statement

cannot be read as "an appeal to desert the Union." *Id.* at 9; *see also id.* at 10 (claiming, without explanation, that neither Gronendyke's nor Teso's statement even "suggest[s]" that "represented employees could capture the wage increase if they abandoned the Union"). Although the court's interpretation of the record is *plausible*, our job under the NLRA is not to determine, in the first instance, the most likely import of employer statements. Instead, and contrary to the court's approach, we must determine only whether the record is "so compelling that no reasonable factfinder" could agree with the Board. *Ozburn-Hessey*, 833 F.3d at 217 (quoting *Bally's Park Place*, 645 F.3d at 935). As discussed, Congress chose this allocation of authority because of the Board's "specialized knowledge and cumulative experience" in discerning the subtext of employer statements, *Garmon*, 359 U.S. at 242—attributes we judges lack.

Next, the Board gleaned animus from two justifications that Prohl proffered for providing the 3% raise only to unrepresented employees, both of which the Board found pretextual. We have long held that "[a] finding of pretext may support an inference of unlawful motive," *Fort Dearborn*, 827 F.3d at 1075, and here both of the Board's pretext findings were well founded.

To begin with, the Board deemed pretextual Prohl's testimony that "she believed that granting the represented employees a 3-percent increase would have made the employees very unhappy and more likely to strike." *Arc Bridges*, 362 NLRB No. 56, at 4 (internal quotation marks omitted). This pretext finding was reasonable given that, as the Board explained, Prohl later offered represented employees a 1.5% raise—a raise even lower than the one she claimed was so low that it would have upset those same employees. *Id.*

Quibbling with the Board's analysis, the court suggests that Prohl may have deemed a strike more likely in October, when she withheld the 3% raise, than in March, when she offered the 1.5% raise. *See* Maj. Op. at 11. This hypothesis is belied by the record. For one thing, the ALJ found that "in October, at the time the wage increase was granted to the nonunit individuals, Prohl was no longer concerned that the granting of the wage increase to the unit employees would precipitate a strike." *Arc Bridges & American Federation of Professionals*, No. 13-CA-44627, 2008 WL 5521196 (2008). For another, no record evidence suggests that a strike risk—if one ever existed—was any different in March than in October. Indeed, in explaining why she later offered the 1.5% raise, Prohl never even mentioned a diminished strike risk. This court is obligated to respect the Board's reasonable pretext finding, rather than adopt an employer's justification that the ALJ rejected or one altogether missing from the record.

The Board also found pretextual "Prohl's additional claim that she provided the wage increase to unrepresented personnel in order to address the high turnover rate among managers and supervisors." *Arc Bridges*, 362 NLRB No. 56, at 4. Substantial evidence supports this pretext determination because if one takes Prohl's "high turnover" justification at face value, the scope of the raise would be both overinclusive and underinclusive. It would be overinclusive because Prohl granted the raise to all unrepresented personnel, even though the high turnover rate afflicted only managers and supervisors; it would be underinclusive because turnover among represented employees rivaled that of managers and supervisors (34% vs. 40%), and yet Arc Bridges gave represented employees no raise.

The court dismisses this analysis as "simply unreasonable." Maj. Op. at 12. According to the court, giving

a raise to all unrepresented employees, rather than just to managers and supervisors, tracked Arc Bridges' "history of raising wages, if at all, for rank and file employees, whenever it raised wages of managers and supervisors." *Id.* at 11. But that is not the explanation Prohl actually gave. Without mentioning past practice, Prohl pointed to "high turnover" among managers and supervisors. And given that this "high turnover" justification is riddled with holes, the Board reasonably inferred that it smacks of pretext. *See, e.g., Pioneer Hotel, Inc. v. NLRB*, 182 F.3d 939, 947 (D.C. Cir. 1999) (employer's faulty justification was "pretextual and intended to conceal [its] true motive").

Finally, the Board found that the suspicious timing of the raise to unrepresented employees evinced antiunion animus. Specifically, the Board reasoned, Prohl waited until October to give the raise, even though she got the green light from the Board of Directors in June and customarily granted raises in July. October falls just before November, which is when the day-services unit's certification year was set to end. And once a union's certification year ends, "an employer may withdraw recognition [from the union] based upon actual evidence [e.g., a petition] that a majority of [unit] employees no longer support[s] the union." *Chelsea Industries v. NLRB*, 285 F.3d 1073, 1075 (D.C. Cir. 2002). All of this allowed the Board to make a fairly obvious inference: by dangling a carrot in front of day-services unit employees just a month before a potential decertification petition, Arc Bridges sought to sway those employees to vote against the union when the time came. In essence, Prohl was saying to day-services unit employees, "look what you can have if you vote against the union."

Given the logical force behind Board inferences of animus based on suspiciously timed, targeted grants of benefits, we regularly decline to second guess them. For example, in *Care*

*One at Madison Avenue, LLC v. NLRB*, 832 F.3d 351 (D.C. Cir. 2016), we held that "[w]hen [an employer] timed the announcement of its discretionary, one-time, system-wide . . . benefit just three weeks before a scheduled representation election, withheld that benefit from only its union-eligible employees, and offered 'the pendency of the representation election' as its sole reason, it violated [§ 8(a)(3)]." *Id.* at 357. True, in that case a union election had already been scheduled when the employer granted the benefit to unrepresented employees. Maj. Op. at 13 n.3. But the *Care One* rule sweeps broadly, applying whether or not an election has been officially marked on the calendar. Without caveat, we said there that "[a]n employer must refrain from interfering with or discouraging the exercise of protected labor rights by either granting or withholding a benefit." *Care One at Madison Avenue*, 832 F.3d at 357.

In sum, the Board reasonably found that the General Counsel carried its threshold burden of establishing that antiunion bias motivated Arc Bridges' refusal to extend a 3% raise to represented employees. Two antiunion statements by supervisors, two pretextual justifications by the Executive Director, and a suspiciously timed raise to unrepresented employees amount to more than enough evidence under *Wright Line*. Given the deference we owe the Board, this court has no basis for reaching the opposite conclusion.

## II.

Under *Wright Line*, once the General Counsel has established its prima facie case, the burden, as Arc Bridges acknowledges, shifts to the employer to show that it would have taken the same action absent antiunion animus. *Fort Dearborn*, 827 F.3d at 1072. Here, the Board concluded that Arc Bridges failed to meet its rebuttal burden because two of

the reasons Prohl offered for her decision were pretextual and the other two not credible.

As detailed above, the Board reasonably found pretextual Prohl's testimony that she sought to avoid making represented employees "very unhappy" and aimed to quell a "high turnover rate" among managers and supervisors. As for Prohl's additional justifications, she allegedly refrained from granting represented employees a 3% raise in order to prevent a loss of bargaining leverage and avoid a section 8(a)(5) violation. But as the Board noted, the ALJ never credited this portion of Prohl's testimony and "at no point . . . [found] those facts to be true." *Arc Bridges*, 362 NLRB No. 56, at 6. Given the absence of an ALJ credibility finding, the Board quite properly lent no credence to these justifications and thus found that Arc Bridges failed to demonstrate a nondiscriminatory reason for its action. *Id.* Because "[c]redibility of witnesses is a matter for Board determination, and not for this court," *Vico Products Co. v. NLRB*, 333 F.3d 198, 209 (D.C. Cir. 2003) (quoting *Joy Silk Mills v. NLRB*, 185 F.2d 732, 741 (D.C. Cir. 1950)), the court was obligated to defer to the Board on this score.

My colleagues are troubled by the Board's "fail[ure] to address why granting a three percent increase to represented employees would not have severely impaired the Employer's bargaining position." Maj. Op. at 12. Yet after finding—in line with the ALJ's decision—that this justification lacked credibility, the Board had no reason to consider it.

Echoing the dissenting Board member, the court believes that Prohl legitimately withheld the raise to avoid a section 8(a)(5) violation. *Id.* at 12–13. This contention implies that Arc Bridges faced a no-win situation: violate section 8(a)(3) by withholding the raise or section 8(a)(5) by granting it. The Board considered and properly rejected this argument. Arc

Bridges ran afoul of section 8(a)(3) not merely because it withheld the raise from represented employees, but because it did so due to antiunion animus. What is more, as the Board noted, Arc Bridges had a simple way to give represented employees a raise without flouting section 8(a)(5): seek the Union's permission to do so. *See Arc Bridges*, 362 NLRB No. 56, at 6 n.18; *see also NLRB v. Katz*, 369 U.S. 736, 743 (1962) (confining holding to "unilateral change[s] in conditions of employment under negotiation"); *accord Honeywell International, Inc. v. NLRB*, 253 F.3d 125, 131 (D.C. Cir. 2001). The court says that asking for such permission may have provoked a strike, Maj. Op. at 13, but as the ALJ expressly found, there was no risk of a strike in October, *see supra* p. 6. The catch-22 the court envisions is thus illusory. *Cf. Care One at Madison Avenue*, 832 F.3d at 359–60 (rejecting similar purported catch-22).