# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 1, 2019         Decided September 3, 2019

No. 18-1091

FIRST STUDENT, INC., A DIVISION OF FIRST GROUP AMERICA,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL & SERVICE
WORKERS INTERNATIONAL UNION, AFL-CIO/CLC, LOCAL
9036,
INTERVENOR

———

Consolidated with 18-1153

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*David A. Kadela* argued the cause for petitioner, First
Student, Inc. With him on the briefs was *Erik Hult*.

*Angelo I. Amador*, *Robert S. Seigel*, *Howard M. Bloom*, *Michael T. Mortensen*, and *Collin O'Connor Udell* were on the brief for *amicus curiae* Restaurant Law Center in support of petitioner/cross-respondent.

*David Casserly*, Attorney, National Labor Relations Board, argued the cause for respondent, National Labor Relations Board. With him on the brief were *Peter B. Robb*, General Counsel, *John W. Kyle*, Deputy General Counsel, *David Habenstreit*, Assistant General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Maneesh Sharma* argued the cause for intervenor Union. With him on the brief was *Amanda M. Fisher*.

Before: ROGERS and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

Opinion concurring in part and dissenting in part filed by *Senior Circuit Judge* SILBERMAN.

ROGERS, *Circuit Judge*: This case involves a successor employer and application of the "perfectly clear" successor doctrine stemming from *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972). First Student, Inc. is the largest provider of school transportation services in North America. Its bid to provide transportation services for Saginaw Public School District was first selected in October 2011, but the School District decided not to proceed because the academic year had already begun. First Student's bid was again selected in February 2012 and contract negotiations began. A few weeks later, First Student representatives met with School District transportation employees who were

covered by a collective bargaining agreement and stated it would offer employment to existing employees, and expressed the desire to retain as many of them as possible. First Student now petitions for review of a Decision and Order of the National Labor Relations Board finding it was a "perfectly clear" successor employer and violated the National Labor Relations Act by changing the terms and conditions on which it would hire the incumbent employees without bargaining with their union. First Student contends that the Board applied the wrong legal standard, departed without justification from its precedent, and made factual findings regarding notice of the new terms and conditions that are not supported by substantial evidence. The Board has cross petitioned for enforcement of its Order. We deny First Student's petition and grant enforcement of the Board's Order in full.

## I.

Congress enacted the National Labor Relations Act to "redress the perceived imbalance of economic power between labor and management . . . by conferring certain affirmative rights on employees and by placing certain enumerated restrictions on the activities of employers." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 316 (1965). Section 7 of the Act provides that employees have certain rights, including the right "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157. Section 8(a)(1) provides that it "shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of" their Section 7 rights. *Id.* § 158(a)(1). Similarly, Section 8(a)(5) makes it "an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees." *Id.* § 158(a)(5). Consequently, an employer violates Section 8(a)(1) and (5) of the Act if it changes terms and conditions of employment unilaterally, i.e., without giving employees an

opportunity to bargain collectively through their union. *Enter. Leasing Co. v. NLRB*, 831 F.3d 534, 546 (D.C. Cir. 2016) (citing *NLRB v. Katz*, 369 U.S. 736, 743 (1962)).

The "perfectly clear" successor doctrine has its origins in the Supreme Court's decision in *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972). *Burns* concerned unionized security guards employed by the Wackenhut Corporation, which provided security for a Lockheed Aircraft Service facility from 1962 to 1967. *Id.* at 274. In April 1967, the guards' union entered into a three-year collective bargaining agreement with Wackenhut. *Id.* at 275. Shortly thereafter Lockheed decided not to renew its security contract with Wackenhut and awarded a new contract to Burns International Security Services. *Id.* Burns hired 27 of the guards formerly employed by Wackenhut and brought in 15 other guards to work at the facility. *Id.* The incumbent union "demanded that Burns recognize it as the bargaining representative of Burns' [guards] at Lockheed and that Burns honor the collective-bargaining agreement between it and Wackenhut," but Burns refused to do either. *Id.* at 275–76.

The Board agreed with the union. Burns was a "successor employer" to Wackenhut because the business of providing security for Lockheed "remained essentially the same despite the change in ownership." *William J. Burns Int'l Detective Agency, Inc.*, 182 NLRB 348, 349 (1970). The incumbent union retained its position as representative of the security guards at the Lockheed facility because, the Board reasoned, the incumbent guards made up a majority of Burns' workforce and there was no reason to believe the change in management would affect the guards' selection of the union. *Id.* at 349–50; *see* 29 U.S.C. § 159(a).

The Supreme Court upheld the Board's determination that Burns, as a successor employer, had an obligation to recognize and bargain with the incumbent union. *Burns*, 406 U.S. at 277–81; *see Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43–44, 46–47 (1987). Given that obligation, Burns' failure to recognize and bargain with the union violated Section 8(a)(1) and (5) of the Act. *Burns*, 406 U.S. at 281. But, the Court made clear, Burns' obligation to bargain with the union "did not mature" until it had "hired [a] full complement of employees"; only then did it become "evident" that the union "represent[ed] a majority of the employees in the unit." *Id.* at 295. Because Burns had no duty to bargain with the union until it finished hiring, it was "free to set initial terms on which it [would] hire the employees of [its] predecessor." *Id.* at 294–95. Critically for present purposes, the Court acknowledged that there are situations in which prior to hiring "it is perfectly clear that the new employer plans to retain all of the [predecessor's] employees." *Id.* Under those circumstances, the Court stated it is "appropriate to have [the successor] initially consult with the employees' bargaining representative before he fixes terms." *Id.* at 295.

The Board first interpreted the Supreme Court's statement about "perfectly clear" successorship in *Spruce Up Corp.*, 209 NLRB 194 (1974), *enforced*, 529 F.2d 516 (4th Cir. 1975). Spruce Up Corporation employed a unionized workforce in 19 barbershops on a military base. *Id.* at 194. In early 1970, the base decided not to renew its contract with Spruce Up and awarded a new contract to Cicero Fowler. *Id.* When the incumbent union "learned that Fowler was the lowest bidder and likely to take over the operation of the Spruce Up barber shops, it requested Fowler to recognize and bargain with it." *Id.* Fowler told the union that he would have no duty to bargain until he began operations, that he intended to pay different rates of commission than Spruce Up had paid, and that he hoped to

hire all incumbent barbers who were willing to work. *Id.* A few days before Fowler took over the barbershops, he sent letters to the incumbents inviting them to work for him on the basis of the new rates. *Id.*

The Board found that Fowler was not a "perfectly clear" successor to Spruce Up because he "made it clear *from the outset* that he intended to set his own initial terms, and that whether or not he would in fact retain the incumbent barbers would depend upon their willingness to accept those terms." *Id.* at 195 (emphasis added). The Board reasoned that Fowler's announcement of new terms created uncertainty about whether incumbents would elect to retain their jobs after the change in management. *Id.* As a result, it was not "perfectly clear" that Fowler "plan[ned] to retain all of" Spruce Up's former employees. *Id.* (quoting *Burns*, 406 U.S. at 294–95). *Spruce Up* thus restricted the "perfectly clear" successor doctrine "to circumstances in which the new employer has either actively or, by tacit inference, misled employees into believing they would all be retained without change in their wages, hours, or conditions of employment," or "has failed to clearly announce its intent to establish a new set of conditions prior to inviting former employees to accept employment." *Id.*

Since then, the Board has refined the nature and scope of the "perfectly clear" successor doctrine. For one thing, the Board has long held that "perfectly clear" successor status may attach not only where a new employer "plans to retain all the [incumbent] employees" but also where it plans to hire "a lesser number but still enough to make it evident that the union's majority status will continue." *Spitzer Akron, Inc.*, 219 NLRB 20, 22 (1975) (first quoting *Burns*, 406 U.S. at 295), *enforced*, 540 F.2d 841 (6th Cir. 1976); *see, e.g.*, *Nexeo Solutions, LLC*, 364 NLRB No. 44, slip op. at 5 n.19 (July 18, 2016). First Student does not contest this.

In addition, a host of post-*Spruce Up* decisions clarify that if a new employer "expresses an intent to retain the predecessor's employees," then it becomes a "perfectly clear" successor unless the new employer "clearly announce[s] its intent to establish a new set of conditions prior to, or simultaneously with, its expression of intent" to retain the employees. *Nexeo*, 364 NLRB No. 44, slip op. at 6; *see, e.g.*, *Creative Vision Res., LLC*, 364 NLRB No. 91, slip op. at 2–3 (August 26, 2016), *enforced*, 882 F.3d 510 (5th Cir. 2018); *Fremont Ford Sales, Inc.*, 289 NLRB 1290, 1296–97 (1988); *Starco Farmers Mkt.*, 237 NLRB 373, 373–74 (1978). An employer that fails to make such an announcement "forfeit[s] the right to set initial terms" of employment. *Fremont Ford*, 289 NLRB at 1296; *see Dupont Dow Elastomers LLC*, 332 NLRB 1071, 1074 (2000), *enforced*, 296 F.3d 495 (6th Cir. 2002). The Board has explicitly rejected the view that an employer can avoid becoming a "perfectly clear" successor by announcing new terms prior to "the extension of *unconditional offers of hire* to the predecessor employees." *Canteen Co.*, 317 NLRB 1052, 1053 (1995), *enforced sub nom. Canteen Corp. v. NLRB*, 103 F.3d 1355 (7th Cir. 1997); *see Elf Atochem N. Am., Inc.*, 339 NLRB 796, 796, 807–08 (2003); *Roman Catholic Diocese of Brooklyn*, 222 NLRB 1052, 1055 (1976), *enforcement denied in relevant part sub nom. Nazareth Reg'l High Sch. v. NLRB*, 549 F.2d 873 (2d Cir. 1977). Instead, the Board has concluded that an employer can become a "perfectly clear" successor before it begins its hiring process. *See, e.g.*, *Paragon Sys., Inc.*, 364 NLRB No. 75, slip op. at 2 (Aug. 26, 2016); *E G & G Fla., Inc.*, 279 NLRB 444, 452 (1986) (citing *CME, Inc.*, 225 NLRB 514 (1976)). For example, the Board concluded in *CME, Inc.* that an employer became a "perfectly clear" successor by expressing an unqualified intent to retain all incumbents when it had not yet offered them jobs or even distributed employment applications. 225 NLRB at 514.

This court has affirmed the Board's interpretation of the "perfectly clear" successor doctrine. *See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. NLRB*, 595 F.2d 664, 672–676 (D.C. Cir. 1978). In *Machinists*, the court observed that the doctrine protects "a successor employer's freedom to alter — even remake — the acquired enterprise" by unilaterally imposing new terms of employment. *Id.* at 673. At the same time, the doctrine affords incumbent employees "an important measure of protection" by ensuring that "they are apprised promptly of impending reductions in wages or benefits" over which the union will have no opportunity to bargain. *Id.* at 674. More recently, the court reaffirmed that the doctrine "prevent[s] an employer from inducing possibly adverse reliance upon the part of employees it misled or lulled into not looking for other work." *S & F Mkt. St. Healthcare LLC v. NLRB*, 570 F.3d 354, 359 (D.C. Cir. 2009).

Our sister circuits have also affirmed the Board's interpretation, acknowledging that "when it is clear that the new employer intends to hire the employees of the predecessor, those employees will place significant reliance on that situation and forego other employment opportunities." *Canteen Corp. v. NLRB*, 103 F.3d 1355, 1364 (7th Cir. 1997) (citing *Machinists*); *see Creative Vision*, 882 F.3d 510, 518–19, 525–26 (5th Cir. 2018) (citing *Machinists*); *Dupont Dow*, 296 F.3d 495, 501–06 (6th Cir. 2002). These courts accept the Board's view that "perfectly clear" successor status may attach when a new employer expresses an intent to retain incumbents even if this precedes the formal hiring process. *See Creative Vision*, 882 F.3d at 518–19; *Dupont Dow*, 296 F.3d at 502; *Canteen Corp*, 103 F.3d at 1363–64. Of the circuits to address the issue, only one — in a pre-*Machinists* decision — has taken the more restrictive view that "perfectly clear" successorship cannot attach "solely on the basis of an expression of intention to

rehire [the] predecessor's employees." *See Nazareth Reg'l High Sch. v. NLRB*, 549 F.2d 873, 881–82 (2d Cir. 1977).

## II.

Through 2011, Saginaw Public School District directly employed approximately 55 bus drivers and other transportation employees. These employees (hereinafter "unit employees") were jointly represented by the United Steel Workers International Union and Local 8410 (collectively "the Union"). The most recent collective bargaining agreement ("CBA") between the Saginaw Board of Education and the Union covered the period of August 27, 2010 through August 31, 2012. The Board of Education voted in October 2011 to accept First Student's services but the School District's Superintendent decided not to proceed for that academic year; in November the School District informed First Student that it planned to open a new bidding process in 2012. It did, and First Student submitted a new bid on February 3, 2012. The School District again selected First Student as the winning bidder, and the parties began negotiating a transportation services contract.

While contract negotiations were ongoing, the School District arranged for First Student officials to discuss the impending transition in management with the unit employees. On March 2, 2012, approximately 40 of the 55 unit employees attended a meeting with Douglas Meek, First Student's area general manager, and Daniel Kinsley, its development manager. Meek told the employees that once the contract was approved, First Student would offer employment to current employees who submitted an application and met its hiring criteria, which included a background check, physical examination, and drug screening, criteria that the Board found were similar to the School District's hiring criteria and

common throughout the bus transportation industry. In responding to employees' questions, Meek testified that he told the employees that First Student "wanted to hire as many individuals as possible," that it would recognize the Union if it hired "51 percent of the existing workforce," and that it "typically" hires "80 to 90 percent of the existing workforce." Hr'g Tr. 420 (July 25, 2013). With respect to how many hours of work employees would be guaranteed, Meek stated that First Student "would know more about that" once it established bus routes for the coming year, which it would do "using the [School] District's routing system." *Id.* at 421. Meek also said matters such as paid time off, vacation pay, and sick pay would be "subject to negotiations." *Id.* at 421–22; *see id.* at 460 (July 26, 2013).

The School District and First Student reached agreement on a five-year transportation services contract in early May 2012. On May 16, the Board of Education held a public meeting to consider whether to approve the contract. In response to Board questions, Kinsley stated that First Student would hire unit employees if they met its hiring criteria, that it "intended to maintain their current wages," and that if 51 percent or more of the incumbents were hired it would recognize the Union. *Id.* at 463–64, 480. The Board of Education voted to approve the contract. Later that day, Kinsley spoke with a Union representative and several unit employees, repeating that First Student's goal was to hire all unit employees who met the hiring criteria, that it would "recognize the Union if [it] hired 51 percent or more" of them, and that "their wages would be maintained." *Id.* at 466, 483. By its terms, the contract was a binding agreement as of May 16. The School Superintendent signed it on May 24 and First Student signed it on June 1.

On May 17, the day after the Board of Education approved the contract and it took effect, First Student officials met with nearly all the unit employees. The officials distributed a memorandum inviting them to apply for employment. The terms and conditions of employment set forth in the memorandum deviated from the CBA in important respects. For example, the memorandum stated that First Student would maintain incumbent employees' current hourly rate of pay for transportation duties but reduce the rate of pay for "non-student transportation duties," such as "attending training, employee or school meetings, clerical work, bus washing, etc." Also, significantly, it guaranteed fewer hours of work than the CBA. Incumbent employees were instructed to submit employment applications no later than May 23 in order to retain their seniority and current wages.

On May 18, the Union contacted First Student requesting to bargain over the terms of a new labor agreement, using the existing CBA as a starting point. First Student responded that it did not know whether it would hire enough of the unit employees to trigger its obligation to recognize and bargain with the Union. The Union agreed to follow up in July, when First Student would be further along in its hiring process. During July and August, the Union's repeated attempts to schedule bargaining with First Student produced no response.

Meanwhile, First Student began hiring employees. After conducting interviews and background checks, it made offers of employment to 42 of the approximately 55 unit employees. Two offer letters were issued on June 27, a third on July 11, and the remainder on August 1. By August 17, 2012, First Student had hired 38 employees, 36 of whom had formerly worked for the School District. When First Student began its operations for the 2012–2013 academic year on August 27, it had hired 51 employees, 41 of whom were unit employees.

That same day, First Student announced an employee attendance policy that differed from the policy in the Union's prior CBA with the School District. In late August, the Union renewed its request to bargain, but First Student still did not come to the bargaining table.

On September 21, the Steel Workers Union (acting through another Local) filed charges with the Board's Regional Office alleging that First Student had violated Section 8(a)(1) and (5) of the Act by "refus[ing] to recognize and bargain with" the Union and by failing to negotiate "over initial terms and conditions of employment" even though it was a "perfectly clear" successor to the School District. On September 25, First Student offered to schedule collective bargaining negotiations in November. The Union responded that it would agree to wait until November provided First Student would abide by the terms of the prior CBA in the meantime. First Student replied that it had no obligation to abide by the CBA and offered to begin negotiations in October if the Union would drop the pending unfair-labor-practice charges. Although the Union did not drop the charges, the parties began collective bargaining negotiations on October 17, 2012.

On April 30, 2013, the Acting General Counsel issued a complaint alleging that First Student had engaged in unfair labor practices in violation of Section 8(a)(1) and (5) of the Act. An administrative law judge ("ALJ") held an evidentiary hearing on July 24–26, 2013. The ALJ found that First Student was a successor to the School District but not a "perfectly clear" successor because it had announced new terms of employment when it distributed employment applications to unit employees on May 17. *First Student, Inc.*, No. 07–CA–092212, slip op. at 24, 2013 WL 6576819 (N.L.R.B. Div. of Judges Dec. 13, 2013) ("*ALJ Decision*"). The ALJ also found that Meek's statements on March 2 sufficed to notify

employees that First Student planned to implement new working conditions. *Id.* at 22–23. The ALJ further found that First Student "had an obligation to recognize and bargain with the Union as of August 17," *id.* at 27, by which time it had "hired a substantial and representative complement of its employees," a majority of whom had previously worked for the School District, *id.* at 18 (citing *Fall River*, 482 U.S. at 52–53). Because of that obligation, the ALJ found that First Student violated Sections 8(a)(1) and (5) of the Act by "delaying bargaining from August 17, 2012, to October 17, 2012" and by "unilaterally implementing attendance policies on August 27, 2012, and September 4, 2012." *Id.* at 31; *see id.* at 27–29. Both parties filed exceptions.

The Board affirmed the violations of the Act found by the ALJ and also found, contrary to the ALJ (and over a dissent), that First Student was a "perfectly clear" successor to the School District as of March 2, 2012, and that First Student violated Section 8(a)(1) and (5) by failing to provide the Union with notice and an opportunity to bargain before imposing initial terms and conditions of employment for unit employees. *First Student, Inc.*, 366 NLRB No. 13, slip op. at 1 (Feb. 6, 2018) ("*Decision*"). Quoting its precedent, the Board stated that "perfectly clear" successor status attaches "when a successor expresses an intent to retain the predecessor's employees without making it clear that employment will be conditioned on acceptance of new terms." *Id.* at 3 (quoting *Nexeo*, 364 NLRB No. 44, slip op. at 6). The Board found:

> From the very beginning of the transition process, well before the formal hiring process began, [First Student] clearly and consistently communicated its intent to retain the School District's unit employees. At the March 2 meeting, [First Student] stated that it would offer employment to all existing employees

who completed applications and met its hiring criteria which, the record establishes, are consistent with the School District's criteria and industry-wide standards. [First Student] underscored this intent by informing the employees that it typically hired '80 to 90 percent' of an existing workforce when taking over transportation duties from another employer. [First Student] also stated that it planned to recognize the employees' existing union representative, so long as '51 percent' of the existing workforce was hired by [First Student]. Thereafter, in comments during and following the May 16 Board of Education meeting, [First Student] reaffirmed its intention to retain the unit employees and further stated that it would be maintaining their existing wages.

*Id.* (footnote omitted).

The Board also found that First Student had not "'clearly announc[ed] its intent to establish a new set of conditions' prior to or simultaneously with its March 2 expression of intent to retain the unit employees." *Id*. (alteration in original) (quoting *Spruce Up*, 209 NLRB at 195). Meek's statement at the March 2 meeting that applicants would have to pass First Student's hiring criteria gave the unit employees "no reason to doubt that they would be hired" because they "had all been hired under similar industry standards by the School District." *Id.* at 3 n.8. And the ALJ had "misinterpreted the import of" Meek's statement that "matters such as paid time off, vacation pay, and sick pay 'would be subject to negotiations,'" taking it to mean that First Student "'would not be adopting the School District's [CBA] and that new working conditions would be implemented.'" *Id.* at 3 (quoting *ALJ Decision* at 23). The ALJ's reasoning was "based on an incorrect premise," the Board concluded, because a statement that employment terms

will be "subject to negotiations" is not inconsistent with "perfectly clear" successor status. *Id.* It is merely "a statement of law"; a "perfectly clear" successor is obligated "only to maintain the status quo . . . until it bargains to agreement or impasse with the representative union." *Id.* Thus, Meek's statement did not notify the unit employees of First Student's plan to change terms *without* negotiating. *See id.* Nor, the Board found, did Meek's statement about guaranteed hours and routes provide sufficient notice. *Id.* at 4. First Student had made no "affirmative statement that terms of employment [would] be changed," instead stating that it "did not have information regarding routes at that time." *Id.*

In addition, the Board found that the ALJ had "misapplied well-established precedent in finding [First Student]'s subsequent announcement of new initial terms and conditions of employment on May 17 was a timely exercise of the *Burns* successor's right to unilaterally establish initial terms and conditions of employment." *Id.* Under longstanding Board precedent, an employer that has become a "perfectly clear" successor cannot vitiate that status by subsequently announcing its intent to unilaterally impose initial terms, even if the announcement is "made before formal offers of employment are extended, or before the successor commences operations." *Id.* (citing *Creative Vision*, 364 NLRB No. 91, slip op. at 3 & n.10 (collecting cases)).

Because First Student became a "perfectly clear" successor on March 2, the Board found that it violated Section 8(a)(1) and (5) by unilaterally changing terms and conditions of employment on and after May 17. *Id.* at 5. The Board found, alternatively, that First Student "became a 'perfectly clear' successor on May 16, when it reiterated its previously expressed intent to retain the predecessor's employees without simultaneously clearly announcing an intent to establish

different initial terms of employment." *Id.* at 5 n.13. The Board also unanimously found that First Student violated Section 8(a)(1) and (5) by "conditioning bargaining on the Union's withdrawal of an unfair labor practice charge." *Id.* at 5. By Order, the Board directed First Student to cease and desist from failing and refusing to bargain in good faith with the Union and to take certain affirmative actions, including making no changes to wages, hours, or other terms of employment without notifying the Union and allowing it to bargain; rescinding changes it had made; making the unit employees whole, with interest and compensation for adverse tax consequences if necessary; and posting a notice describing its statutory violations and employees' rights for 60 days in conspicuous places. *See id.* at 5–6.

Then-Chairman Kaplan partially dissented, taking the position that "perfectly clear" successor status does not attach "when 'a successor *expresses an intent* to retain the predecessor's employees'" but rather when it issues formal offers of employment. *Id.* at 7 (quoting *Nexeo*, 364 NLRB No. 44, slip op. at 6). He acknowledged that his position was contrary to at least three Board decisions. *See id.* (citing *Creative Vision*, 364 NLRB No. 91; *Nexeo*, 364 NLRB No. 44; *Canteen Co.*, 317 NLRB 1052).

The Board majority offered three responses: First, the dissent's "more restrictive interpretation" of the "perfectly clear" successor doctrine "is inconsistent with the express language of the Supreme Court in *Burns*." *Id.* at 4. In *Canteen Co.*, 317 NLRB at 1053, the Board pointed out that *Burns* did not limit "perfectly clear" successorship "to such a late point in the transition from one employer to another; instead, the status attaches, the Supreme Court stated, when it is evident "that the new employer plans to retain all of the [incumbent] employees," 406 U.S. at 294–95. Second, the dissent's

position "does not take into account the significant reliance employees may place on statements of intent to hire, to the exclusion of other employment opportunities." *Id.* By contrast, the Board explained, its practice of "[h]olding a successor to its initial statements of intent, even when those statements are made before formal offers of employment are extended or the transfer of ownership or operations is complete, prevents prospective employers from inducing such reliance, only later to reveal that the employees' terms of employment will be changed." *Id.* at 4 & n.12 (citing *S & F Mkt. St.*, 570 F.3d at 359; *Machinists*, 595 F.2d at 674–75). Third, the Board's interpretation in its precedent "serves the important statutory policy of fostering industrial peace in what the Supreme Court has recognized may be an unsettling transition period for unions and employees alike." *Id.* at 4 (citing *Fall River*, 482 U.S. at 39–40).

First Student petitions for review of the Board's Decision and Order. The Board cross petitions for enforcement of its Order.

## III.

First Student contends that the Board's Decision must be vacated because it misstated the legal standard for "perfectly clear" successorship, deviating without justification from Board and court precedent. None of First Student's arguments that the Board erred as a matter of law is persuasive. In addition, First Student contends there is not substantial evidence to support the Board's finding that Meek's statements of March 2 provided insufficient notice to unit employees of First Student's intent to unilaterally impose new terms. That too is unpersuasive. First Student does not challenge the Board's findings of its other violations of the Act, and the Board is therefore entitled to summary enforcement of those

portions of its Order, *see, e.g.*, *Carpenters & Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 808 (D.C. Cir. 2007).

The Supreme Court has repeatedly recognized that the National Labor Relations Board "has the primary responsibility for developing and applying national labor policy," *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990),  and consequently its interpretations of the Act are "entitled to considerable deference" by the courts and must be upheld if "reasonably defensible," *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 891 (1984); *see NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 711–12 (2001); *NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 89–90 (1995).  This court similarly "yield[s] deference" to the Board's interpretation of the "perfectly clear" successor doctrine emanating from *Burns*.  *Machinists*, 595 F.2d at 672–73 & n.41.  Congress, in turn, has determined that the Board's findings of fact "shall be conclusive" "if supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e).  It also has required that all objections first be presented to the Board, otherwise the court lacks jurisdiction to consider them.  *Id.* § 160(e)–(f).

## A.

The Board stated: "To avoid 'perfectly clear' successor status, a new employer must clearly announce its intent to establish a new set of conditions prior to, or simultaneously with, its expression of intent to retain the predecessor's employees." *Decision* at 3 (quoting *Nexeo*, 364 NLRB No. 44, slip op. at 6).  First Student views this as "a reengineered test" that "fundamentally alter[s]" and "conflicts with" *Spruce Up*. Pet'r's Br. 23–25.  According to First Student, *Spruce Up* presumes that a successor retains the right to unilaterally impose terms and conditions of employment, and permits a finding of "perfectly clear" successorship only where "the

presumption [is] overcome by evidence that [the] successor, by word or deed, misled the predecessor's employees." *Id.* at 24. First Student maintains that under this standard, Meek's statements to the unit employees at the March 2 meeting were not sufficiently misleading to trigger "perfectly clear" successorship. *Id.* at 30.

The Board's articulation of the "perfectly clear" test in *Nexeo* does not conflict with *Spruce Up* as First Student suggests. In *Spruce Up*, 209 NLRB at 195, the Board expressly declined to "delineat[e] . . . the precise parameters" of the "perfectly clear" successor doctrine. It concluded only that a new employer may avoid becoming a "perfectly clear" successor by "clearly announc[ing] its intent" to unilaterally impose new terms of employment. *Id.* A wealth of subsequent Board decisions summarize and clarify that a new employer *must* "clearly announce" such an intent in order to preserve its right to unilaterally impose new terms of employment. *See, e.g.*, *Nexeo*, 364 NLRB No. 44, slip op. at 5–6. This clarification is consistent with *Spruce Up*'s statement that "perfectly clear" successorship may occur where a new employer "has either actively, *or by tacit inference*, misled employees." 209 NLRB at 195 (emphasis added); *see, e.g.*, *Dupont Dow*, 332 NLRB at 1073–75. As this court has recognized, it is also consistent with the rationale behind the "perfectly clear" successor doctrine: incumbent employees may be "lulled into a false sense of security" by an employer's "announcement of job-availability" even if they "are not affirmatively led to believe that existing terms will be continued." *Machinists*, 595 F.2d at 674–75; *see Creative Vision*, 882 F.3d at 518–19, 525–26; *Dupont Dow*, 296 F.3d at 501–02, 506; *Canteen Corp.*, 103 F.3d at 1364.

First Student also contends the Board departed from its own precedent regarding the earliest point at which "perfectly

clear" successor status can attach. *See* Pet'r's Br. 24–25. The Board found that First Student became a "perfectly clear" successor when it initially "expressed its intent to retain employees on March 2." *Decision* at 3. First Student interprets *Spruce Up* not to allow "perfectly clear" successor status to attach "prior to [the successor's] inviting former employees to accept employment." Pet'r's Br. 25 (alteration in original) (quoting *Spruce Up*, 209 NLRB at 195). It maintains, therefore, that it avoided becoming a "perfectly clear" successor by announcing new terms when it distributed employment applications to unit employees at the May 17 meeting. *See id.* at 30–31.

First Student overreads the relevant portion of *Spruce Up*. There, the Board had no occasion to specify when "perfectly clear" successor status can attach because Fowler announced his intent to unilaterally implement new commission rates when he first "expressed a general willingness to hire" the incumbent barbers. *Spruce Up*, 209 NLRB at 194–195. Subsequently confronted with the issue, the Board settled on the position that a successor becomes "bound . . . to bargain about initial terms" upon expressing its "intent to hire all of the predecessor's employees" without concurrently announcing new terms. *Canteen Co.*, 317 NLRB at 1053–54; *see, e.g.*, *Creative Vision*, 364 NLRB No. 91, slip op. at 3; *Fremont Ford*, 289 NLRB at 1296–97; *Starco Farmers Mkt.*, 237 NLRB at 374–75. As the Board has explained and three of our sister circuits have affirmed, this prevents a new employer from misleading incumbent employees between an initial expression of intent to retain them and a formal offer that they apply for or accept employment. *See Creative Vision*, 882 F.3d at 518–20; *Dupont Dow*, 296 F.3d at 502–06 & n.1; *Canteen Corp.*, 103 F.3d at 1363–64.

First Student further contends it was legal error for the Board to find that it became a "perfectly clear" successor before it had finalized its transportation services contract with the School District. *See* Pet'r's Br. 18–23; Reply Br. 3–9. It suggests its circumstance "is not materially different" from four Board decisions "in which a prospective successor's pre-contract communications were not found to trigger perfectly clear successor status." Pet'r's Br. 20. But in all four cases, the Board had no occasion to resolve whether the status can be triggered by pre-contract statements because it found "perfectly clear" successor status based on post-contract statements. *See Morris Healthcare & Rehab. Ctr., Inc.*, 348 NLRB 1360, 1360 & n.2, 1362–64, 1367 (2006); *Hilton's Envtl., Inc.*, 320 NLRB 437, 437–38 (1995); *Fremont Ford*, 289 NLRB at 1296–97; *Spitzer Akron, Inc.*, 219 NLRB at 22–23 (1975). Other Board precedent indicates that a pre-contract expression of intent to rehire incumbent employees *can* trigger "perfectly clear" successorship. In *Elf Atochem*, 339 NLRB at 798–800, for example, an incoming employer expressed its intent to retain incumbents after signing a "nonbinding letter of intent" to acquire the predecessor company. The Board held that the employer became a "perfectly clear" successor at that time, *id.* at 796, even though the parties had only announced "a planned sale," not a contract, and the acquisition was not finalized until several weeks later, *id.* at 798, 800. The Sixth Circuit in *Spitzer Akron*, 540 F.2d at 843–45, was similarly satisfied that the employer became a "perfectly clear" successor while it was still negotiating the terms on which it would purchase the predecessor business.

Not only is the Board's finding that First Student was a "perfectly clear" successor consistent with Board precedent, it also rests on a reasonable interpretation of the "perfectly clear" successor doctrine. To begin, the Board's interpretation is consistent with the Supreme Court's understanding that the

doctrine applies where "it is perfectly clear that the new employer *plans to retain* all the employees in the unit." *Burns*, 406 U.S. at 294–95 (emphasis added). Nothing in *Burns* prevents the doctrine from applying where, as here, an employer's bid to provide transportation services has been selected and while it is working out the details of a final contract it informs incumbent employees that it plans to retain them.

The Board's interpretation also furthers the purpose of the "perfectly clear" successor doctrine, which is to protect incumbent employees from being "lulled into a false sense of security" when a new employer expresses interest in retaining them. *Machinists*, 595 F.2d at 674–75 & n.49; *see S & F Mkt. St.*, 570 F.3d at 359. "Holding a successor to its initial statements of intent, even when those statements are made before . . . the transfer of ownership or operations is complete, prevents prospective employers from inducing [employee] reliance, only later to reveal that employees' terms of employment will be changed." *Decision* at 4. Here, First Student induced such reliance from March 2 through May 16. *See id*. at 3–5 & nn.8, 13. Had unit employees learned of the impending wage and guaranteed-hour reductions at the March 2 meeting, they might have sought other employment or even urged the Board of Education to reject the proposed contract with First Student. But First Student did not announce the impending changes to the terms and conditions of employment under the Union's former CBA until after the Board of Education had approved the contract; to the contrary, First Student had publicly declared that it "intended to maintain the wages for the current work force." Hr'g Tr. 466, 480 (Kinsley). Not until May 17 — six days before First Student's application deadline for unit employees desiring to keep their wage rates and seniority — did First Student inform employees that it intended to decrease their wages and guaranteed hours. Under

the circumstances, the Board could reasonably conclude that First Student had engaged in the sort of misleading conduct that the "perfectly clear" successor doctrine is meant to prevent.

Neither does the Decision unduly burden a successor employer's right to unilaterally set the initial terms on which it will hire incumbent employees, as First Student and *amicus* suggest, *see* Pet'r's Br. 22, 25; Amicus Br. of Restaurant Law Ctr. 11–15. The Supreme Court has observed that a new employer controls whether it will be obligated to recognize an incumbent union at all. *See Fall River*, 482 U.S. at 40–41. The employer incurs that obligation only if it "makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor." *Id.* at 41. The Board's interpretation allows a likely successor that has not yet finalized its contract to acquire an existing business — First Student's situation as of March 1 — to control whether it will retain its right to unilaterally set initial terms of employment. *See Dupont Dow*, 296 F.3d at 503; *Canteen Corp.*, 103 F.3d at 1364–65. First Student could have declined to meet with the unit employees on March 2 or told them that it planned to exercise the right to set initial terms and conditions of employment. Nor has the Board's interpretation deprived an incoming employer of the flexibility to adjust its formal offer to potential employees based on the outcome of its own services contract negotiations. The employer need not specify the new terms during its initial communication with employees. Rather, the employer need only convey its *intent* to make unilateral changes; it can determine the details later. *See Banknote Corp. of Am.*, 315 NLRB 1041, 1043 (1994), *enforced*, 84 F.3d 637 (2d Cir. 1996). The Board's approach, leaving the successor employer in control, has reasonably balanced employers' rights against employees' reliance interests. *See Dupont Dow*, 296 F.3d at 505–06 n.1; *Machinists*, 595 F.2d at 674–75.

In sum, First Student fails to show that the Board's Decision rests on a legally erroneous interpretation of the "perfectly clear" successor doctrine.

A few words about the dissent. Heeding the Supreme Court's frequent admonition that "balancing competing interests to effectuate national labor policy . . . is a delicate responsibility committed primarily to the Board," this court has held that the Board's interpretations of the "perfectly clear" successor doctrine are entitled to considerable deference. *Machinists*, 595 F.2d at 672–73 & n.41 (citing *NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 350 (1978)). Such deference is appropriate, this court reasoned, because *Burns* provides "minimal guidance" about the doctrine and fleshing out its details squarely implicates the Board's area of expertise. *Id.* at 673 n.41. The dissent's suggestion that in *Machinists* the court was "actually deferring to the Board's evidentiary finding," Dis. Op. 3, is clearly in error. The court's opinion speaks clearly for itself, expressly stating it "yield[s] deference to the Board's construction" of *Burns*, which the court concluded "reasonably implements the considerations reflected in *Burns* considered as a whole," describing itself as "constrained" to accept the Board's interpretation because it was not "unreasonable." *Machinists*, 595 F.2d at 672–73 & n.41, 675–76. That is the law of the circuit absent *en banc* review. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 2006).

Further, this court is without jurisdiction to consider any "objection that has not been urged before the Board." 29 U.S.C. § 160(e); *see id.* § 160(f). First Student has never challenged the Board's longstanding position that a "perfectly clear" successor need not plan to hire all incumbent employees,

but rather to hire "enough to make it evident that the union's majority status will continue" after the change in management, *Spitzer Akron*, 219 NLRB at 22. Our dissenting colleague acknowledges that First Student "expressly waived" any such challenge, yet despite the jurisdictional bar engages in a lengthy discussion of his views. Dis. Op. at 1–5. Neither has First Student argued that the Board's approach could lead a new employer to violate Section 8(a)(2) of the Act; its briefs do not even mention that provision. Our dissenting colleague raises the issue himself, volunteering that First Student would have violated Section 8(a)(2) if it had begun negotiating with the Union on March 2. *See* Dis. Op. 8–9. This is not the appropriate occasion for the court to address these arguments by our dissenting colleague, for, contrary to the congressional design, the Board has had no opportunity to do so in the first instance.

Coming to an issue that First Student did preserve, the dissent argues that First Student could not have been obligated to bargain with the Union as of March 2 because "it was still in negotiations." Dis. Op. 8 *see id.* at 8–9. But our dissenting colleague glosses over the distinction between an employer's duty to "bargain with the employees' representatives before it changes any terms to which its predecessor had agreed," *S & F Mkt. St.*, 570 F.3d at 358; *see Burns*, 406 U.S. at 295, and a duty to immediately begin bargaining. Here, the Board concluded that First Student had only "an obligation to bargain *over initial terms*," *Decision* at 5 (emphasis added), as of March 2; that is, First Student "forfeited the right to set initial terms" as of that date, *Fremont Ford*, 289 NLRB at 1296. The Board acknowledges in its brief to the court that First Student could have waited to begin bargaining until it had finalized its contract with the School District or even until it had hired a substantial and representative complement of its workforce, so long as it maintained the *status quo* in the meantime. Resp't's

Br. 36. The dissent's approach would permit an incoming employer to mislead employees about its intentions until it finalizes its acquisition of the predecessor. The Board has reasonably prevented such misleading conduct by allowing "perfectly clear" successorship to attach when an incoming employer "expresses an intent to retain the predecessor's employees," even if it has not yet finalized the acquisition. *See, e.g.*, *Nexeo*, 364 NLRB No. 44, slip op. at 6.

Our dissenting colleague "can't imagine" that unit employees could have been disadvantaged by First Student's false promise to maintain their wages because it came just one day before First Student announced it would unilaterally reduce their wages. Dis. Op. 8. Record evidence indicated the critical nature of, and the Board of Education's reliance, on First Student's misrepresentations when voting to approve the transportation services contract on May 16, 2012, as did the Union representative and unit employees in attendance at its public meeting. The Assistant Superintendent of the School District pointed out that "the focus of the [Board of Education] meeting was ensuring that the employees received the same rate of pay and . . . comparable benefits because that was the concern of the Board [of Education] and of the superintendent." Hr'g Tr. 386 (July 25, 2013) (Dr. Kelley Peatross). Given the evidence that employees were disadvantaged by First Student's misrepresentations at the May 16 meeting, the Board could reasonably conclude that even if First Student had not become a "perfectly clear" successor on March 2, it would have become one on May 16. *Decision* at 5 n.13. And like the employer in *Canteen Co.*, 317 NLRB at 1052–53, First Student could not vitiate its "perfectly clear" successor status by announcing new terms the following day.

**B.**

Alternatively, First Student contends that Meek's statements at the March 2 meeting gave unit employees adequate notice of its intent to impose new terms of employment because the Board's contrary finding is not supported by substantial evidence. Pet'r's Br. 28–29; Reply Br. 13–17. In assessing the adequacy of a successor employer's statements about whether and on what terms it will retain incumbent employees, the court will not reverse the Board's factual findings, in view of the Board's expertise, unless "the record is 'so compelling that no reasonable fact finder could fail' to find to the contrary." *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (quoting *United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993)). That is not the situation here, for the Board's dismantling of the ALJ's findings supports its finding that First Student did not "clearly announce its intent to establish a new set of conditions," *Spruce Up*, 209 NLRB at 195.

To avoid becoming a "perfectly clear" successor, First Student had to "convey its intention to set its own terms and conditions rather than adopt those of the previous employer." *S & F Mkt. St.*, 570 F.3d at 361; *see, e.g.*, *Ridgewell's, Inc.*, 334 NLRB at 37–38. First Student contends that it conveyed such an intention at the March 2 meeting. *See* Pet'r's Br. 29. It considers the "most important[]" evidence to be Meek's statement that "certain matters about which employees asked, including paid time off, vacation pay and sick pay, would be 'subject to negotiation[].'" Reply Br. 15 (quoting Hr'g Tr. 421–22); *see* Pet'r's Br. 4. It also points to Meek's statement that the company "did not know how many hours would be guaranteed to employees but that it would know more once routes were established." Pet'r's Br. 4 (quoting *ALJ Decision* at 22).

The Board found Meek's declaration that certain matters would be "subject to negotiations" did not notify unit employees that First Student planned to unilaterally change their terms of employment. *See Decision* at 3 & n.9 (citing *Road & Rail*, 348 NLRB 1160). It explained that the statement "contain[ed] no mention or reservation of the right to act unilaterally." *Road & Rail*, 348 NLRB at 1162. Instead, the Board concluded, First Student's expressions of intent to negotiate with the Union suggested that it would *not* make changes unilaterally. *See id.* Neither was Meek's statement about guaranteed hours "an affirmative statement that terms and conditions [would] be changed," *Decision* at 4, especially since it was accompanied by assurances that First Student would continue to use the District's routing system, *see* Hr'g Tr. 421.

First Student views its case as indistinguishable from *Banknote Corp.*, 315 NLRB 1041, and *Marriot Management Services, Inc.*, 318 NLRB 144 (1995). Pet'r's Br. 28–29; Reply Br. 16–17 & n.7. In *Banknote*, the incoming employer sent incumbent employees a letter stating that it intended "to attempt to hire its initial workforce from among" their ranks but had not agreed to recognize the incumbent union or be bound by the existing CBA. 315 NLRB at 1047. The Board found this statement to provide adequate notice of new terms and conditions. *Id.* at 1043. In *Marriott*, the incoming employer was even more explicit, stating that it "would not adopt the extant collective-bargaining agreement" and "that the health and welfare package and the pension plans would have to be changed." 318 NLRB at 144. The Board concluded, understandably, that Meek's remarks on March 2 were far less clear than the statements in *Banknote* and *Marriott*. Instead of announcing that First Student would unilaterally impose new terms and conditions, they suggested "that the status quo [might] change as a result of negotiations, but not in advance

of them." *Decision* at 3. Therefore, the Board did not impermissibly depart from precedent by finding that First Student failed to clearly announce on March 2 its intention to impose new terms and conditions of employment.

First Student's attempt to analogize its case to *S & F Market Street*, 570 F.3d 354, where the court reversed a "perfectly clear" successor finding on substantial-evidence grounds, *see* Pet'r's Br. 25–28, fares no better. In that case, the incoming employer concluded that it would need to "replace the staff" but could not do so all at once. *S & F Market Street*, 570 F.3d at 356. It therefore distributed job applications informing incumbents that it "intend[ed] to implement significant operational changes," that any employment would be temporary and at will, and that it could "change benefits, policies and conditions at any time." *Id.*; *see id.* at 360. Given these statements, the court observed that when the employer expressed interest in retaining the employees "no employee could have failed to understand that significant changes were afoot." *Id.* Nothing of the kind can be said here, because First Student repeatedly stated its intent to retain the unit employees and publicly promised to maintain their wages but then unilaterally imposed new terms, including wage reductions, the day after the Board of Education approved its transportation services contract with the School District.

The dissent reaches its contrary factual finding, *see* Dis. Op. 5–7, by applying the wrong legal standard. The dissent claims that "the basic question" is First Student's "intention," i.e., "whether or not it planned to maintain the municipality's compensation package." *Id.* at 6. But the relevant question is not one of subjective intention; rather, it is the objective question whether First Student gave the employees sufficiently clear notice that it was going to unilaterally change terms and conditions of employment. *See S & F Mkt. St.* at 360;

*Machinists*, 595 F.2d at 674–75; *Creative Vision*, 364 NLRB No. 91, slip op. at 5; *Dupont Dow*, 332 NLRB at 1074–75. The inquiry is conducted "from the perspective of employees," *Fall River*, 482 U.S. at 43–44, because the "perfectly clear" successor doctrine protects employees from being "misled or lulled into not looking for other work," *S & F Mkt. St.*, 570 F.3d at 359. Further, the dissent fails to conform its analysis to the court's deferential standard of review of Board findings. It mischaracterizes the ALJ's finding that First Student did not mislead employees as a "judgment on credibility," Dis. Op. 7, and ignores substantial evidence supporting the Board's factual finding that First Student's statements were not "sufficiently clear to put [unit employees] on notice that there would be [significant] changes in the initial terms and conditions of their employment." *Decision* at 4.

Moreover, our dissenting colleague's attempt to ignore the Board's factual findings, and the attendant limited nature of the court's scope of review, *e.g.*, Dis. Op. 2,6,7,10, is ultimately to no avail. The dissent concedes that if the second employer had stated that it planned to hire all of the predecessor's bargaining unit employees (and that would be majority of its workforce), employees would be entitled to assume that their wages and working conditions would remain unchanged. Dis. Op. 5. The Board found that First Student had stated it planned to hire the bargaining unit employees, who had previously met standard criteria First Student identified, and a majority of its employees were the predecessor's bargaining unit employees. Because there is substantial evidence in the record considered as a whole to support the Board's findings, its findings are "conclusive." 29 U.S.C. § 160(e).

Accordingly, we deny First Student's petition for review and grant the Board's cross-petition for enforcement of its Order in full.

SILBERMAN, *Senior Circuit Judge*, concurring in part and dissenting in part: Before I discuss the parties' positions, it is necessary to explain the governing law because, in my view, the Board has essentially ignored it. The important cases are *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972), *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43 (1987) and *International Ladies' Garment Workers' Union v. NLRB* (*Altmann*), 366 U.S. 731 (1961), and two opinions of our Court, *International Ass'n of Machinists & Aerospace Workers v. NLRB*, 595 F.2d 664 (D.C. Cir. 1978), and *S & F Market Street Healthcare LLC v. NLRB*, 570 F.3d 354 (D.C. Cir. 2009). *Burns* established that if an employer takes over another business organized by a union and a majority of its new work force constituted employees who were previously part of the predecessor's bargaining unit, and are performing essentially the same work, the new employer becomes a "successor," with an obligation to bargain with the union. The determination as to whether the second employer has hired a majority of its employees from the previous bargaining unit is determined when the secondary employer has reached its normal operation and has hired a "substantial and representative complement." *See Fall River*, 482 U.S.

However, in a nod to a dynamic economy, the Court modified the *Katz* Doctrine – whereby an employer cannot unilaterally introduce changes in wages, hours, and working conditions, *see NLRB v. Katz*, 369 U.S. 736, 743 (1962) – to permit a successor to put into effect its own working conditions package. Of course, it would still have an obligation to bargain with the union, but the status quo from which bargaining would proceed would be the employer's package.

The Court, however, set forth what we described as a "narrow" exception to this employer right. *See Machinists*, 595 F.2d at 673. Normally, the new employer would not be a successor until it actually hired a majority of bargaining unit employees, but the Court recognized that sometimes it is

"perfectly clear that the new employer plans to retain all of the employees in the unit" (and that the previous employees will constitute a majority), in which case it is obliged to consult (bargain) with the union before making changes. *Burns*, 406 U.S. at 294-95. (In other words, *Katz* would apply.)

It is crucial to note that the only factor the Supreme Court relied on to distinguish a so-called "perfectly clear successor" from an ordinary successor was the employer's plan to hire *all* of the bargaining unit employees, presumably as a group.[1] In our case, both the ALJ and the Board found Petitioner anticipated hiring only a majority of employees, not that it planned to hire *all* of the bargaining unit employees. In a meeting on March 2, Petitioner's representative emphasized applicants would have to pass its hiring criteria, and that in past cases where Petitioner had taken over in a conversion, between 80 and 90 percent of the existing work force was hired. Still, Petitioner's representative warned that it would only bargain with the union *if* it hired a majority of the bargaining unit employees.

The majority observes that the hiring criteria used by the former employer (the School District) was essentially the same, so it would be expected that the employees would qualify, but that ignores a new organization's possibly different application of criteria, such as driving tests. It is clear to me that the Petitioner intended to make individual decisions rather than planned to hire all the bargaining unit employees as a group – which is what the Supreme Court contemplated. Indeed, only 41 out of 55 were actually hired. The ALJ determined that under *Fall River*, it was not until August 17 that Petitioner became an ordinary successor.

_____

[1] Of course, even if a successor plans to hire all the bargaining unit employees, one or more might drop off.

The Board implicitly recognized this hole in its case by arguing before us that the *Burns* test for a "perfectly clear successor" could be satisfied if an employer planned to hire *most* of the bargaining unit employees (apparently some number between a majority and all). Resp't's Br. 21. But that just flies in the face of the Supreme Court's language and represents a regulatory agency's rebellion. Indeed, in both *Machinists*, 595 F.2d at 673, and *S & F Market Street*, 570 F.3d at 358-59, we reiterated the requirement that the perfectly clear successor is one that plans to hire *all* the bargaining unit employees of the predecessor.

The majority reasons that in *Machinists*, we determined that we were obliged to defer to the Board's interpretation of the perfectly clear successor concept. A careful analysis of the opinion reveals that the Court did not actually defer to the Board's interpretation of the term "perfectly clear successor," but rather to what indications would be relevant in determining whether or not an employer planned to hire all of the incumbent bargaining unit employees.[2] We affirmed the Board's determination that Boeing, the successor employer, was not a "perfectly clear successor" because it had announced before taking over that it would pay lower wages and benefits. The Board reasoned – which we thought logical – that the employer who announced that it would pay lower wages and benefits was not planning to retain *all* of the bargaining unit employees. We recognized, *Machinists*, 595 F.2d at 673 n.41, that deferring to a Board's interpretation of a Supreme Court opinion was not equivalent to the level of deference we give an agency's interpretation of a statute, but we noted that the Board's

[2]As a part-time law school professor, I am struck by the impact of the decline of the Socratic method and the reliance on computers – which pick up stray comments in opinions – leading to the atrophy of legal analysis.

reasoning was consistent with the spirit and purpose of the Supreme Court's short definition of a perfectly clear successor. So we were actually deferring to the Board's evidentiary finding that the employer did not meet the Supreme Court's test.

Of course, if the second employer were to, in accordance with *Burns*, indicate that it planned to hire all of the predecessor's bargaining unit employees (and that would be a majority of its workforce), employees would be entitled to assume that their wages and working conditions would remain unchanged. And if the successor were to institute new wages and working conditions upon the transition, the Board's concern with misleading employees would be legitimate.[3]

To be sure, this is not the first case in which the Board has asserted its "less than all" position, *see, e.g.*, *Spitzer Akron, Inc.*, 219 NLRB 20, 22 (1975), *enforced*, 540 F.2d 841 (6th Cir. 1976), but I believe the Board is clearly wrong as a matter of law. Unfortunately for Petitioner, it forfeited – even expressly waived at oral argument – a challenge to the Board's transformation of the word *all* to a much lesser number. Therefore, I agree with the majority concerning the failure of Petitioner to preserve this argument. I have, nonetheless, written about this troubling Board effort to frustrate the Supreme Court and our Court's interpretation of a perfectly clear successor for the benefit of a subsequent case. I would not ordinarily discuss a matter not raised, but it is impossible to understand what the Board has done without realizing how convoluted has been its abandonment of the Supreme Court's test.

In that regard, I believe the Board's further expansion of its perfectly clear successor doctrine is also illegal. The Board, as

---

[3]The majority's accusation that my position is indifferent to the misrepresentation of employees is inaccurate. Maj. Op. 26.

in this case, now asserts that a successor – who expects to hire some number more than a majority – is a perfectly clear successor *unless* it makes clear that it intends to alter the bargaining unit's compensation or working conditions. Otherwise, in the Board's view, employees could be "misled," thinking the status quo would be maintained and thereby encouraged to remain. The Board, as should be apparent, has taken the logic of *Machinists* and reversed it. Whereas *Machinists* approved the Board concluding that a successor who proposed a diminution of compensation or working conditions could not be thought to hire *all* of the bargaining unit employees. Now the Board – having ignored the "all" requirement – concludes that a successor who plans to hire some number more than a majority is a perfectly clear successor if it does not affirmatively state that it plans to change the compensation package.

If the Board had properly applied *Burns*, *Machinists*, and *S & F Market Street* limiting the perfectly clear successor to a successor who planned to hire all of the bargaining unit employees, this would have been totally inapposite. Let me explain. If the record showed that a successor planned to hire all of the predecessor's bargaining unit employees as a group and nothing more about its plans, it would be assumed, legitimately, that a planned seamless transition is contemplated in which compensation and benefits would be maintained (which is what the Supreme Court obviously envisioned). It would only be if the successor announced an intention to *lower* the wages and benefits that one could conclude, as was true in *Machinists*, that the employer did *not* plan to hire all of the bargaining unit employees. Once the Board illegally expanded the concept to include an employer who plans to hire most of the bargaining unit employees — only those who qualify – then it further expanded the perfectly clear successor doctrine by determining that the successor employer was stuck with a perfectly clear

successor restraint unless it affirmatively stated that it intended to change wages and working conditions.

Petitioner did object to the Board's imposition of the burden on the successor, who wished to avoid perfectly clear successor status, to affirmatively state that it planned to change the employment conditions. It argued that the Board's requirement goes far beyond any concern with misleading employees and is, therefore, arbitrary and capricious.[4] I agree, but as I have explained, the Board's concern would be irrelevant – at least with regard to the definition of a perfectly clear successor – if the Board had legitimately applied *Burns*.

\* \* \*

Still, even assuming the Board's convoluted interpretation of *Burns* was legitimate and Petitioner was obliged to signal that it wished to make changes in working conditions in order to avoid being classified as a perfectly clear successor, I think the Board's determination that Petitioner did not disclose that it planned a change lacked substantial evidence. Petitioner gave every indication that should it take over, working conditions could change. Besides indicating that it wouldn't even have an obligation to bargain unless it hired 51 percent of the employees, in response to questions, it said that working hours would be determined by the school district's routing system and that employment conditions, like paid time off, vacation pay, and sick pay, would be subject to negotiations – which certainly indicates that Petitioner did not intend to commit to the same conditions. The majority determines that First Student's statement that certain matters – terms and conditions of employment – would be subject to negotiations with the union

---

[4]For instance, I do not understand how it could be said that an employer who was silent about his plans misled employees.

indicates that it did not intend to put in those terms initially. But that conclusion misunderstands labor law. Even if a successor employer is allowed under *Burns* to put in place terms and conditions unilaterally, it would be obliged to bargain with the union; it just means it can bargain from its own base. The sufficiency of these statements is particularly clear given the context in which they were made. The transition from a public to private employer would put any reasonable employee on notice that economic "changes were afoot." *S & F Market Street*, 570 F.3d at 360. Why else would the municipality make the change?

I am emboldened in my view that the Board's factual conclusions lack substantial evidence because the basic question is the employer's intention – whether or not it planned to maintain the municipality's compensation package. We should bear in mind that the ALJ – whose judgment on credibility issues must be weighed heavily by the Court of Appeals, *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496-97 (1951) – concluded that Petitioner did not mislead employees and gave fair indication that working conditions would not necessarily be continued under its auspices. The majority thinks that the ALJ's determination, as to what plans Petitioner had, is not as important as how its views were understood by employees, relying on *Fall River*. But *Fall River* is a case dealing with a much more complicated question as to whether a new company is a successor, not a perfectly clear successor. It involves a range of issues and the Supreme Court did conclude that how the employees, who leave one company and end up at a second, see their status is very important in determining whether the second company is a successor, but at no time did the Supreme Court ever suggest that *Fall River*, in any way, modified *Burns*, or its narrow exception. The perfectly clear successor test relies entirely on the successor's plans, not the employee's views.

Still, even if the employee's view of the Petitioner's plans are determinative, the Board's hypothesis that Petitioner's plans were not "sufficiently clear to put [the employees] on notice that there would be changes in the initial terms and conditions of their employment" – even given the Board's expertise – is arbitrary and capricious. *See First Student, Inc.*, 366 NLRB No. 13, slip op. at 4 (Feb. 6, 2018). I can't imagine that any employee was misled into believing that existing terms and conditions were sacrosanct. The Board is simply putting an unreasonable burden on a successor inconsistent with the Supreme Court's clear objective.

\* \* \*

That brings me to the most important issue that Petitioner did preserve. It argued that it was a legal error for the Board to conclude that it was a perfectly clear successor as of March 2. I agree. At that point, Petitioner was not even an employer – it was still in negotiations. To be sure, if in March Petitioner had unequivocally stated that it planned to hire all of the bargaining unit employees, it would be legitimate to determine that it was a perfectly clear successor when it did complete the transition. Yet the Board determined that it had, *as of March 2*, a bargaining obligation with the union. In my view, that is ridiculous. That was four months before the ALJ, in accordance with the *Fall River* standard. determined that Petitioner was an ordinary successor.

Indeed, if at that stage it had entered into negotiations with the union, it would have violated Section 8(a)(2).[5] *See Altmann*, 366 U.S. at 737-40 (concluding employer violated the Act by

---

[5]To the extent the Board has endorsed a contrary view in *Road & Rail Services, Inc.*, 348 NLRB No. 77 (Nov. 30, 2006), its reading, to which we owe no deference, is incorrect.

recognizing union that claimed, but did not demonstrate, that it represented a majority – notwithstanding employer's good faith); *see also Majestic Weaving Co.*, 147 NLRB 859, 860-61 (1964) (holding that employer violated the Act when it negotiated agreement with union contingent upon union gaining majority support), *amended by*, 149 NLRB No. 135 (Dec. 9, 1964), *enforcement denied*, 355 F.2d 854 (2d Cir. 1966). The majority implies that my reference to *Altmann* is a new argument, but relying on a Supreme Court case that supports Petitioner's argument is never a new argument. *See Amax Land Co. v. Quarterman*, 181 F.3d 1356, 1363 (D.C. Cir. 1999). And since Petitioner made the contention that it could not become a perfectly clear successor as of March 2, it is quite permissible to draw attention to a case illustrating why that argument is sound.

It is black letter labor law that a bargaining obligation includes the requirement to bargain over a union's proposal, including one to change the status quo. Yet simply by recognizing and bargaining with the union, First Student would be in violation of Section 8(a)(2) because it would be telling employees who was their bargaining representative before the employees have chosen. In other words, to simply recognize a union as the bargaining agent – without the necessary showing of employee support – is a violation of Section 8(a)(2) – whether or not a new agreement is reached.

The majority suggests, based on statements of the Board's counsel (who did not object that 8(a)(2) was a legitimate consideration), that the March 2 bargaining obligation was not *really* a bargaining obligation in which an employer must respond to a union's proposal, but that is simply inconsistent with the Board decision. *See First Student,* 366 NLRB No. 13, slip op. at 5 (finding "that the General Counsel has met his burden of proving that the Respondent became a 'perfectly clear' successor, with an obligation to bargain over initial terms,

on March 2"); *see also id.* at 4 n.13 (concluding that "there is no impediment to holding that the Respondent's bargaining obligation attached on March 2"). And that it was only some months later that First Student was determined to have delayed bargaining in violation of the Act, which the majority emphasizes, is absolutely irrelevant as to its legal status on March 2. The majority acknowledges that First Student had an obligation, but it was only an obligation to bargain over initial terms, but that is exactly what the Supreme Court has held to be illegal without a showing of majority status. The Board's counsel's suggestion that Petitioner could have waited to bargain until it had hired a substantial and representative complement of its workforce is a *post hoc* explanation and inconsistent with the Board's opinion.

The Board seems to have recognized that it was on thin ice relying on March 2 because it suggested an alternative date that Petitioner became a perfectly clear successor. That date was May 16 – only the day before Petitioner announced its actual working conditions package. Even if the Board's theory that a company becomes a perfectly clear successor if it plans to hire most, rather than all, and moreover, does not affirmatively state that the employment conditions will be significantly different were correct, relying on May 16 statements, is arbitrary and capricious (unreasonable). After all, the Board's theory is such statements are necessary so that employees are not misled to their detriment, and it is pure fantasy to imagine that anyone would be disadvantaged by a statement on May 16 that was different from the actual terms and conditions announced on May 17.

The majority suggests that even if employees were not misled on May 16, only one day before Petitioner invited applications, nevertheless the Board of Education, with whom Petitioner was contracting, relied on Petitioner's statements on

May 16. But what that has to do with disadvantaging the employees, or even the price of tea, is beyond me. The majority's creative suggestion is not part of the Board's decision, nor could it be. It has nothing to do with the employer's labor relations or the National Labor Relations Act.

*  *  *

This case discloses a rather disturbing effort on the part of the Board to substantially nullify a right given to employers, under a Supreme Court opinion, by vastly expanding a narrow exception to that right.